GREAT LAKES SOCIETY v GEORGETOWN CHARTER TOWNSHIP

Docket Nos. 270031, 280574, and 2805477. Submitted October 14, 2008, at Grand Rapids. Decided October 30, 2008, at 9:05 a.m. Leave to appeal sought.

Great Lakes Society, a Michigan ecclesiastical corporation, brought two actions in the Ottawa Circuit Court against Georgetown Charter Township and the township's zoning board of appeals, challenging the board's denial of a special use permit and a variance that Great Lakes sought to allow it to construct a building for worship services and supporting ministries. The board had concluded that the principal purpose of the proposed building was not for public worship and that the building, therefore, was not a church under the zoning ordinance. While Great Lakes' permit application was pending, the township had amended the zoning ordinance establishing street-frontage requirements for churches, and the board denied the variance request because it failed to meet the amended requirements. The court, Calvin L. Bosman, J., affirmed the denial of a special use permit, agreeing that the proposed building was not a church because its principal use, as determined by the activities to take place in the building, would not be for public worship. The court further concluded that the appeal of the denial of a variance was moot because Great Lakes was not eligible to apply for the variance sought if the building was not a church. The court, however, granted Great Lakes partial summary disposition on its constitutional claims and its claim under the Religious Land Use and Institutionalized Persons Act, 42 USC 2000cc *et seq.* Great Lakes and the defendants appealed by leave granted.

The Court of Appeals *held*:

1. The trial court erred by concluding that for zoning purposes the proposed building was not a church. The correct standard is whether the building is used for public worship and reasonably closely related activities or uses. It was undisputed that the building would be used for public worship. Most of the other activities to take place in the building, including meditation, a youth center, counseling, ministerial training, and a health ministry, are reasonably closely related in substance and in space to the public-worship use.

2. The amended zoning requirements applied to Great Lake's request for a variance. As a general rule, the law to be applied in a zoning decision is the law in effect at the time of the decision. A court will not apply an amendment to a zoning ordinance, however, if the amendment was enacted in bad faith. Of the churches constructed in the township before the amendment, all but three have street frontage that meets the amended requirements, and those three have street frontage that is much closer to the requirement than that of Great Lakes' property. It is clear that the intent of the zoning ordinance was always to require at least 200 feet of street frontage and that Great Lakes' application alerted the township's zoning authorities of the need for an amendment clarifying that. The amendment was not enacted as a reason to deny Great Lakes' application. The amendment governs the use of property throughout the township, not just Great Lakes' property.

3. The board based its denial of Great Lakes' request for a variance on competent, material, and substantial evidence on the record, as required by MCL 125.3606(1)(c).

4. The trial court erred by determining that implementation of the ordinance violated 42 USC 2000cc(a) by placing an improper substantial burden on Great Lakes' religious exercise. Great Lakes is able to locate a church at some other location within the township as long as the property complies with the ordinance or qualifies for a variance by more closely complying with the ordinance requirements

5. The trial court erred by determining that Great Lakes' constitutional claims were valid under the facts of this case. The street-frontage requirement and its imposition on Great Lakes was a valid exercise of a generally applicable zoning scheme and did not violate the right of Great Lakes' members to freely exercise their religion. The ordinance did not deny the right to freedom of association because the ordinance (1) is content neutral, (2) is narrowly tailored to serve a legitimate governmental objective, and (3) leaves open ample channels of alternative means of association. Great Lakes failed to show that it has been treated differently from any similarly situated church and thus has not shown an equal protection violation.

Affirmed in part, reversed in part, and remanded for entry of partial summary disposition for the defendants.

1. ZONING — CHURCHES.

A building is a church, for zoning purposes, if it is used for public worship and activities or uses that are reasonably closely related in substance and in space to the public-worship use.

2. Zoning — Ordinances — Amendments of Ordinances.

> A court should generally apply the version of a zoning ordinance that
> was in effect at the time of the zoning decision, but an exception
> exists with respect to the application of an amended ordinance if
> the amendment was enacted in bad faith; among the factors to
> consider in determining whether there was bad faith is whether
> the amendment was intended to provide clarification or whether
> the amendment was enacted for the purpose of manufacturing a
> reason to deny an application for a permit or variance.

*McCroskey, Feldman, Cochrane & Brock, PLC* (by
*John M. Karafa*), and *Roman P. Storzer* for the plaintiff.

*Smith Haughey Rice & Roegge* (by *William L. Henn*
and *Craig R. Noland*) for the defendants.

Amicus Curiae:

*Bauckham, Sparks, Rolfe, Lohrstorfer & Thall, P.C.*
(by *John K. Lohrstorfer*), for the Michigan Townships
Association.

Before: O'CONNELL, P.J., and BANDSTRA and GLEICHER,
JJ.

BANDSTRA, J. In Docket No. 270031, plaintiff Great
Lakes Society (GLS) appeals by leave granted the trial
court's opinion and order affirming the denial by defen-
dant Georgetown Charter Township Zoning Board of
Appeals (ZBA) of GLS's request for a special use permit
and for a variance. In Docket Nos. 280574 and 280577,
defendants appeal by leave granted the trial court's
opinion and order granting GLS partial summary dis-
position on its claims under the Religious Land Use and
Institutionalized Persons Act (RLUIPA), 42 USC
2000cc *et seq.*, and the Michigan and United States
constitutions.

We conclude that the trial court applied an incorrect
legal standard in deciding that the building GLS pro-

posed to build was not a "church" under the township ordinance and that, under the correct analysis, it is a church. Nonetheless, we conclude that the ZBA properly decided not to grant a variance with respect to the proposed building location and that it did not violate the RLUIPA or any constitutional guarantees by making that decision. Accordingly, we affirm in part, reverse in part, and remand this matter for entry of an order granting defendants summary disposition on GLS's statutory and constitutional claims. We do not retain jurisdiction.

### I. FACTUAL BACKGROUND AND PROCEEDINGS BELOW

GLS is a Michigan ecclesiastical corporation and an IRS-recognized religious organization exempt from taxation under 26 USC 501(c)(3), and describes itself as ministering to persons having varying degrees of chemical sensitivities to common environmental pollutants. GLS seeks to construct a two-story building, approximately 9,700 square feet in size, for worship services and supporting ministries, on a six-acre parcel of property owned by GLS pastor John Cheetham (Cheetham property), located in defendant Georgetown Charter Township (the Township). The Cheetham property is zoned low-density residential (LDR). Section 8.3(A) of the Georgetown Charter Township zoning ordinances permits construction of "churches" in a residential district with a special use permit (SUP).

GLS filed its initial SUP application on April 17, 2002, and its second SUP application on February 18, 2003. According to those applications and additional information about the proposed building that GLS provided to the ZBA, the building would include (1) a 2,400-square-foot sanctuary, including a reception area, coatroom, bathrooms, kitchen, and special heating/cooling and air-

filtration equipment, for a maximum of 60 people to participate in Sunday worship services;[1] (2) a 1,600-square-foot counseling ministry area, including meeting rooms, a group conference room, a waiting lounge, and bathrooms; (3) a 1,500-square-foot tape/publication ministry area, including a recording studio, tape-copying equipment, publishing equipment, a mailing room, and a computer room; (4) an 1,800-square-foot ministerial training ministry area, including classrooms, a research library, a study area, an exercise room, a kitchen, and a bathroom; (5) a 1,200-square-foot administration area, including a ministerial office, a board of elders conference room, a bathroom, and a secretary/treasurer's office; (6) a 375-square-foot health ministry area; (7) a youth center, and (8) a large garage to house a GLS transport van, snow clearing/landscape equipment, space for a visiting minister's car, and recycling bins. The main floor was also to include airlock entrances and a mechanical/electrical/filter room.

GLS explained the purpose of the supporting ministries to the ZBA. According to GLS, its counseling ministry provides spiritual counseling to church members on an individual and group basis to facilitate their spiritual growth. John Cheetham and Timothy DeYoung, ordained ministers, are GLS's spiritual counselors. No fees are charged for counseling services.[2] Rather, as with all of

---

[1] GLS representatives explained that the sanctuary was designed to accommodate, at most, 60 people at one time because that was the maximum number of individuals who could be present while still maintaining an environment permitting chemically sensitive members to worship together.

[2] Contrary to this assertion, the ZBA received affidavits and deposition testimony from Harold and Anna Mae DeYoung, the parents of GLS pastor Timothy DeYoung, indicating that they were "charged" a rate of $40 an hour and a total of more than $200 for two counseling sessions

GLS's supporting ministries, donations are accepted; this is consistent with the religious belief that such giving is to be done voluntarily and "cheerfully."[3] GLS's ministerial training ministry is necessary to achieve "perpetual existence of [GLS] as a religious organization" and is an integral part of continuing GLS's form of worship and mission. A youth center was included in the proposed building in anticipation of future growth in membership and as a means to strengthen youth connection to the group and to God. The youth center would also be used for weddings, funerals, Bible forums, and other religious or worship functions. GLS's tape/publication ministry "supports members' ability to worship through personal study of Christ's teachings" and is an effective means of "evangelistic outreach for new members."

GLS described its "health ministry," termed a food cooperative or nutritional service by the Township, as a "very minor portion of [the] entire ministry," arising out of GLS's mission, which includes "teach[ing] and practic[ing] the health and nutritional principles as revealed in the Holy Scriptures and . . . provid[ing] for the members . . . as Christ taught to provide." The health ministry provides GLS members with access to

with Cheetham. This money, which GLS characterized as a "donation," was returned to the DeYoungs because, according to GLS, the DeYoungs did not consider it to be a gift.

[3] GLS does not have any system of tithing or pledge contributions; its sole means of financial support comes from member donations. According to Cheetham:

GLS has a strict policy of only accepting free-will donations for any of its spiritual ministries. Therefore any and all donations given to GLS in the past and in the future are understood and received for the spiritual purposes defined in [GLS's] Mission Statement. The defining principle is "For God loves a cheerful giver."

specialty food items and fragrance-free products. It also allows members to obtain "ordinary" items in a fragrance-free environment.[4] Cheetham characterized the health ministry as "a spiritual service that is essential to the well-being of the members." Members cannot participate in the health ministry until they "establish a spiritual connection" by "show[ing] their commitment through interest . . . in the spiritual teachings of [GLS]." Cheetham explained:

> [GLS's] nutritional practice is an integrated and critical part of [its] worship in much the same way that Jews would follow Kosher standards. Chemically sensitive and allergenic people find that [the GLS] Health Ministry is essential to their spiritual and physical health as well as their ability to worship and hold supporting jobs for their personal survival.

Cheetham further explained that GLS members were not required to pay for items they obtained from this ministry, but were free to make a donation to GLS in appreciation for this service.[5] Cheetham acknowledged that GLS had a one-line advertisement in the phone book under the heading of "nutritionists," using the name "Nutritional Research" at the Cheetham property address. According to Cheetham, this was GLS's most effective form of outreach to the public; when people called to express an interest in nutrition, it gave

---

[4] Currently, GLS's health ministry operates out of the existing house on the Cheetham property; approximately 12 members and one or two supporters of GLS obtain products from the health ministry. Food deliveries for GLS members began in 1984. UPS deliveries occurred two to three times a week and, until April 2002, a semi-truck made additional deliveries once a month.

[5] Cheetham noted that some members included their "regular spiritual donation" with their health ministry donation and, therefore, he thought there was too much emphasis placed on the amount of the health ministry donations in the ZBA proceeding.

GLS an opportunity to relate nutritional questions to spirituality. Cheetham believed that "[a]t least 80 percent" of GLS's current members came to the group through the nutrition route; the others were referrals.[6]

GLS presented the ZBA with documentary evidence establishing that other area churches also housed ancillary services, including youth centers, preschools, day-care centers, multipurpose rooms, gymnasiums, a coffee bar, a dance studio, a book store, a printing office, libraries, offices, and kitchens, and that many of them had large garages. GLS also presented documentary evidence indicating that a number of area churches offered counseling services, ministerial training, and other ministerial services, such as performing weddings or funerals, for a fee. Finally, GLS provided documents showing that several churches had sanctuaries that comprise less than 30 percent of the church building.

Following a remand from the trial court to allow the parties to further develop the record, the ZBA concluded that the principal purpose of GLS's proposed building was not for public worship and, therefore, that the proposed building is not a church for purposes of the zoning ordinance.[7] Consequently, GLS's SUP application was denied.

---

[6] GLS is registered with the state of Michigan as a nonprofit food cooperative. Cheetham explained that GLS was instructed by state officials to use the term "co-op" because that was the only way to achieve exemption from having to obtain a license as a food establishment for the health ministry.

[7] Because the term "church" is not defined in the Township's zoning ordinance, which instructs that undefined terms "shall have the meanings customarily accepted," the ZBA consulted the *Oxford American Dictionary*, which defines a church as "a building for public worship."

On February 24, 2003, while GLS's SUP application was pending with the Township, the township board approved an amendment of § 20.4(E) of the zoning ordinance relating to street-frontage requirements for churches constructed in residential districts. Before this amendment, GLS believed that the Cheetham property met, or would be able to meet, the requirements of § 20.4(E). However, the Cheetham property did not meet the amended requirements. Consequently, GLS applied for a variance from the frontage requirements in § 20.4(E) as amended. The ZBA denied GLS's variance request, concluding that it failed to meet the specific standards for granting a variance set forth in the zoning ordinance.[8]

---

[8] Section 28.11(C) of the ordinance provides:

Variances. The [ZBA] shall have the power to authorize, upon an appeal, specific variances from the requirements of this Ordinance, when the applicant demonstrates that ALL of the following conditions will be satisfied.

(1) Granting the variance be [sic] in the public interest and will ensure that the spirit of this Ordinance shall be observed.

(2) Granting the variance shall not permit the establishment within a district of any use which is prohibited, nor shall any use variances be granted.

(3) That there are practical difficulties in complying with the standards of the Zoning Ordinance resulting from exceptional, extraordinary, or unique circumstances or conditions applying to the property in question, that do not generally apply to other property or uses in the vicinity in the same zoning district; and have not resulted from the adoption of this Ordinance.

(4) That the granting of such variance will not be of substantial detriment to adjacent properties or improvements in the vicinity; or, that the application of conditions to an approved variance will eliminate or sufficiently mitigate potential detrimental impacts.

In reaching this decision, the ZBA noted the purposes of the requirement from which a variance was sought, as well as the degree of the variance sought. More specifically, the Township planner observed, with the ZBA's concurrence, that the purpose of requiring that a church constructed in a residential zone have 200 feet of frontage on a major street is to ensure adequate sight distance for traffic entering and leaving the church site, to provide sufficient spacing between the access point to the church and adjacent property lines and driveways, to minimize confusion with regard to multiple driveways within a limited distance, to provide reasonable vehicle "stacking space" in front of the church property, and to minimize conflict with adjacent driveways with vehicles turning left into the site. Additionally, the ZBA observed that the Cheetham property has only 66 feet of frontage on a major street and, therefore, that the variance sought from the 200-foot requirement was "huge." The ZBA took note that all but three of the 37 churches in the Township have 200 feet of frontage on a major street, as required by § 20.4(E)(2). Of the three noncompliant churches, the first was constructed more than 50 years ago and has 165 feet of frontage on a major street, the second was constructed more than 20 years ago and has 153 feet of frontage on a major street, and the third, constructed in 1990, was granted a variance to have less road frontage on a major

(5) That granting such variance is necessary for the preservation of a substantial property right possessed by other properties in the vicinity in the same zoning district.

(6) That granting such variance will not cause any existing non-conforming use, structure, or condition to be increased or perpetuated, contrary to the provisions of Chapter 27 of this Ordinance, expect in accordance with Section 27.12.

(7) That the variance is not necessitated as a result of any action or inaction of the applicant.

street; it has 132 feet of frontage on two separate major streets.[9] On the basis of these considerations, the ZBA denied the variance request.

GLS appealed the ZBA's denial of both the SUP and the variance in the Ottawa Circuit Court, by way of two separate complaints, each of which also asserted claims under RLUIPA and the Michigan and United States constitutions, as well as for superintending control. The trial court first concluded that, under Michigan law, whether a building is a "church" is properly ascertained by evaluating the "principal use" of the building as determined by the activities that take place in the building. After observing that "[t]here is record evidence that supports the ZBA's conclusion that the principal use of the proposed building would not be for public worship," the trial court concluded that the decision of the ZBA that the proposed building was not a church for zoning purposes was supported by competent, material, and substantial evidence on the record. The trial court further concluded that GLS's appeal of the ZBA's denial of a variance was moot because, the proposed building not being a church, GLS was not eligible to apply for the variance sought.

Later, in response to cross-motions for summary disposition of GLS's RLUIPA and constitutional claims, the trial court determined that GLS's construction of the proposed structure would constitute "religious exercise" under RLUIPA. Consequently, the trial court concluded that the determination that the proposed building was not a church and the denial of a variance

---

[9] Because of the relatively small degree of variance sought in that case, and because that church had frontage on two separate major streets, so as to divide the effect of any traffic concerns, that case was not considered to be of precedential value by the ZBA in deciding whether to grant GLS's request for a variance in the instant case.

amounted to a "substantial burden on religious exercise," were capricious and not in furtherance of a compelling governmental interest, and, therefore, contravened the "substantial burden" provision of RLUIPA, 42 USC 2000cc(a). The trial court further determined that the GLS members' constitutional right to the free exercise of religion was "coextensive with GLS's rights under RLUIPA" and, thus, that the ZBA's actions violated that right as well. Further, the trial court concluded that the ZBA's actions violated GLS's members' constitutional rights to freely associate and to equal protection.[10]

## II. ANALYSIS

### A. IS THE PROPOSED BUILDING A CHURCH?

GLS first argues that the trial court erred in affirming the ZBA's determination that its proposed building does not constitute a church for zoning purposes. We agree.

Ordinances are treated as statutes for the purposes of interpretation and review. *Soupal v Shady View, Inc,* 469 Mich 458, 462; 672 NW2d 171 (2003). Hence, the interpretation and application of a municipal ordinance presents a question of law, which this Court reviews de novo. *City of Riverview v Sibley Limestone,* 270 Mich App 627, 630; 716 NW2d 615 (2006). The goal of

---

[10] The trial court concluded, however, that the ZBA's actions did not violate the "equal terms," "nondiscrimination," or "total exclusion/unreasonable limitation" provisions of RLUIPA, 42 USC 2000cc(b), and did not infringe GLS members' constitutional rights to due process, freedom of assembly, or free speech and further that GLS "failed to state a claim on which relief can be granted in superintending control." GLS has not cross-appealed the trial court's grant of partial summary disposition to defendants on the counts of its complaints presenting these claims.

statutory construction, and thus of construction and interpretation of an ordinance, is to discern and give effect to the intent of the legislative body. *Neal v Wilkes,* 470 Mich 661, 665; 685 NW2d 648 (2004). Terms used in an ordinance must be given their plain and ordinary meanings, and it is appropriate to consult a dictionary for definitions. See *Halloran v Bhan,* 470 Mich 572, 578; 683 NW2d 129 (2004).

Generally, courts review a decision of a zoning board to determine whether it complies with the constitution and the laws of the state, is based on proper procedure, is supported by competent, material, and substantial evidence on the record, and represents the reasonable exercise of the board's discretion. MCL 125.3606. The determination of " 'the facts which, taken together, can be said to describe the situation' " presented by GLS's practices and building proposal is a factual matter, and the ZBA decisions in that regard are entitled to deference. *Macenas v Village of Michiana,* 433 Mich 380, 395-396; 446 NW2d 102 (1989) (citation omitted). However, the manner in which the zoning ordinance applies to those facts, i.e., whether the proposed building is a church for purposes of the ordinance, is a question of law, for this Court to decide as a matter of review de novo. *Id.* at 396.

For the reasons discussed below, the circuit court erred in concluding that Michigan law requires that a proposed building constitutes a church only if its principal use is public worship. Consequently, the circuit court erred in concluding that GLS's proposed building does not constitute a church. Rather, the correct standard is whether the building is used for public worship and reasonably closely related activities or uses. The record evidence is undisputed that the proposed building was to be used for regular public worship. Further,

the other identified uses are reasonably closely related, in substance and in space, to that public worship use. Therefore, the proposed GLS building constitutes a church for purposes of the zoning ordinance.

The trial court relied on *Portage Twp v Full Salvation Union*, 318 Mich 693; 29 NW2d 297 (1947), in analyzing whether the proposed GLS building is a "church" within the meaning of that term in the Township zoning ordinance. *Portage*, like the present case, involved a zoning ordinance that allowed a church to be located in residential zoning districts. *Id*. at 696-697. At issue were "camp meetings" that were held during the summers and the construction of small buildings to accommodate some campers and to provide meals on a no-profit/at-cost basis. *Id*. at 698. The plaintiff township brought suit, seeking an injunction to prevent those uses of the defendant's property. The Supreme Court quoted the dictionary definition of "church," which was a " 'building set apart for public worship . . . .' " *Id*. at 700. It then determined that religious gatherings at which some people would " 'camp,' in the ordinary meaning of that word," using the small buildings for residential purposes, did not constitute a church activity. *Id*. The logic of *Portage* was that, because those buildings were not "set apart for public worship" in any way, but were instead residential in nature, they did not fall within the usual definition of a "church."

The issue in *Portage* was significantly different from the issue here. The issue here is whether a proposed building that *is* to be used for public worship loses its status as a church because it also is to be used for other purposes. The trial court here erred in concluding that *Portage* addressed that question in any fashion. The trial court further erred in concluding that *Portage*

stands for the proposition that a building is a church only if its *principal* use is public worship. The trial court, citing *Portage*, reasoned that "[u]nder Michigan law, a 'church' is a building set apart whose principal use is for public worship. . . . The question, then, is what is to be the 'principal use' of GLS's proposed building." However, the term "principal use" is not found anywhere within *Portage*. And further, the dictionary definition quoted by *Portage* required only that a building be "set apart for public worship" to be considered a church. *Portage*, 318 Mich at 700. There was no suggestion whether the public worship function of the building must be its principal or predominant use, a significant or substantial use, or simply one of its uses in order to qualify as a church.

As with the ordinance in *Portage*, the ordinance at issue here does not define a "church." Therefore, as in *Portage*, this Court will turn to current dictionary definitions of "church" to find the ordinary meaning of that term as it is used in the ordinance. *Stanton v Battle Creek*, 466 Mich 611, 617; 647 NW2d 508 (2002) ("When determining the common, ordinary meaning of a word or phrase, consulting a dictionary is appropriate."). It does not appear that the dictionary definition of "church" has changed much in the 60 years since *Portage* was decided; it is today simply defined as "a building for public . . . worship." *American Heritage Dictionary, Second College Edition*; accord *Random House Webster's College Dictionary* (2000); *Merriam-Webster's Collegiate Dictionary, Eleventh Edition*. The dictionary definition makes no suggestion about how exclusive or substantial the public worship use of a building must be for it to qualify as a church. If anything, comparing this "building for" definition to the "building set apart for" definition referred to in

*Portage* suggests that less exclusivity or substantiality is needed under the current usage of the term "church."

In any event, it is clear that a building must be used to some extent for public worship to fall within the definition of "church." The record here is unrefuted that regular worship services would be conducted for the GLS membership in the proposed building, and the ZBA has acknowledged that worship would take place there.[11] The argument at issue is whether, notwithstanding that use, the proposed building is not a church because of the nonworship activities and uses that will occur within it. There being no Michigan precedent addressing that question in the zoning context,[12] we turn to a brief review of such precedents from other jurisdictions. *People v Rogers*, 438 Mich 602, 609; 475 NW2d 717 (1991).

As a general matter " '[c]hurches . . . and other institutions dedicated to religious objectives are in some degree protected from the full impact of zoning restrictions. These uses are favored for reasons ranging from their unique contribution to the public welfare to constitutional guarantees of freedom of worship.' " *Rapid City v Kahler*, 334 NW2d 510, 512 (SD, 1983) (deletion added), quoting 2 Anderson, American Law of Zoning (2nd ed), § 12.18. Thus, for example, it is an "almost

---

[11] The ZBA argued that worship would not be open to the general public, but would be limited to a relatively closed group. However, Pastor Cheetham's testimony that anyone who is interested may attend GLS services and that the proposed building is designed to facilitate future growth is unrefuted. A conclusion that the worship expected to occur at the building would not be public is not supported by the requisite evidence. MCL 125.3606(1)(c).

[12] But see *Roman Catholic Archbishop of Detroit v Orchard Lake*, 333 Mich 389; 53 NW2d 308 (1952), discussed below. As defendants observe, precedents defining a "church activity" for tax cases are inapposite because they rest on policy concerns not at issue in zoning cases.

universal rule that churches and their attendant uses are permitted in residential areas . . . ." *Church of Jesus Christ of Latter Day Saints v Idaho Falls*, 92 Idaho 571, 574; 448 P2d 185 (1968); accord *In re Diocese of Rochester v Brighton Twp Planning Bd*, 1 NY2d 508, 522; 154 NYS2d 849; 136 NE2d 827 (1956) ("It is well established in this country that a zoning ordinance may not wholly exclude a church or synagogue from any residential district.") (emphasis deleted). As one court has reasoned, churches need not be established only in sparsely settled areas; instead, "wherever the souls of men are found, there the house of God belongs." *O'Brien v Chicago*, 347 Ill App 45, 51; 105 NE2d 917 (1952). Consistent with these principles, the Michigan Supreme Court noted that as early as 1787, in the Northwest Ordinance for the Northwest Territory, part of which became the state of Michigan, religion and morality were declared to be " 'necessary to good government and the happiness of mankind.' " *Roman Catholic Archbishop of Detroit v Orchard Lake*, 333 Mich 389, 394; 53 NW2d 308 (1952). Accordingly, the Court concluded that churches could not be completely excluded from a municipality. *Id.*

As a corollary to the favored status of churches, courts have held that zoning authorities must be flexible and accommodating in reviewing requests to permit church building projects. "It is well settled that . . . greater flexibility is required in evaluating an application for a religious use than an application for another use and every effort to accommodate the religious use must be made." *In re Genesis Assembly of God v Davies*, 208 AD2d 627, 628; 617 NYS2d 202 (1994) (citations omitted).

One component of this accommodating and flexible approach is to broadly define what constitutes a

"church" activity or use in light of changing ecclesiastical purposes and circumstances. " '[T]he concept of what constitutes a church has changed from a place of worship alone, used once or twice a week, to a church used during the entire week, nights as well as days, for various parochial and community functions.' " *Beit Havurah v Norfolk Zoning Bd of Appeals*, 177 Conn 440, 447-448; 418 A2d 82 (1979), quoting 2 Rathkopf, Zoning & Planning, § 20.03, p 20-53 (1978). More than half a century ago, the New York Court of Appeals handed down an often-cited summary of what constitutes a church in contemporary society:

> A church is more than merely an edifice affording people the opportunity to worship God. Strictly religious uses and activities are more than prayer and sacrifice and all churches recognize that the area of their responsibility is broader than leading the congregation in prayer. Churches have always developed social groups for adults and youth where the fellowship of the congregation is strengthened with the result that the parent church is strengthened . . . . When a member of the congregation cements friendships with other members of the congregation, the church benefits and becomes stronger. It is a religious activity for the church to provide a place for these social groups to meet, since the church by doing so is developing into a stronger and closer knit religious unit. To limit a church to being merely a house of prayer and sacrifice would, in a large degree, be depriving the church of the opportunity of enlarging, perpetuating and strengthening itself and the congregation. [*In re Community Synagogue v Bates*, 1 NY2d 445, 453; 154 NYS2d 15; 136 NE2d 488 (1956).]

There are, however, limitations to this approach: "the religious aim of strengthening the congregation through fellowship may not be permitted to be perverted into a justification for establishing a place of entertainment, such as a country club . . . ." *Id.* "The activity or use must be intended to promote the pur-

poses for which the church is instituted, the most, but not sole, prominent purpose of which is the public worship of God." *Solid Rock Ministries Int'l v Monroe Zoning Bd of Appeals*, 138 Ohio App 3d 46, 55; 740 NE2d 320 (2000).[13] A relationship test is generally used in this regard: "the activities or the use to which the property is put must be reasonably closely related, in substance and in space, to the church's purpose." *Id*.; accord, e.g., *Idaho Falls*, 92 Idaho at 574.

While we recognize that these foreign precedents are not binding on this Court, they are nonetheless persuasive authority. *Rogers*, 438 Mich at 609. They represent a broad agreement of opinion from our sister states and are consistent with cited zoning treatises and other authorities. Further, they flow from and are consistent with the deference for religious and church activities and uses in the zoning context recognized by our Supreme Court in *Orchard Lake*. Accordingly, we adopt these principles as a matter of Michigan law and apply them in determining this appeal.[14]

---

[13] The *Solid Rock* court explained more fully:

[A] church is more than a mere building used solely for worship. Religious use has been defined to mean conduct with a religious purpose. In turn, any building used primarily for purposes connected with the faith of the congregation or to propagate such faith has been deemed used for church purposes. We agree that a church cannot enjoy completely unfettered use of its property just because the activities conducted on the property bear some relation to a church purpose. To fit within the definition of a church or church use, the activities or the use to which the property is put must be reasonably closely related, in substance and in space, to the church's purpose. [*Solid Rock*, 138 Ohio App 3d at 55.]

[14] We find the precedents relied on by defendants, *North Pacific Union Conference Ass'n of the Seventh Day Adventists v Clark Co*, 118 Wash App 22; 74 P3d 140 (2003), and *Hayes v Fowler*, 123 NC App 400; 473 SE2d 442 (1996), factually distinguishable from the instant matter. In *North*

To begin, as explained earlier, there is no doubt that the proposed building would be used for public worship. The question then becomes whether the other uses of the building are reasonably closely related, in substance and in space, to that public worship use.

All the proposed activities would occur within the same building. Accordingly, the spatial relationship test is not at issue. With respect to whether the other activities are reasonably closely related in substance to the public worship function of the proposed building, almost all of them clearly are. That is certainly true for the meditation and prayer rooms that adjoin the worship center. They provide space for traditional worship activities in a more intimate, small group setting. As explained in *Bates*, the youth center and other areas of the building designed to strengthen the fellowship of the GLS congregation serve to enrich GLS as a worshipping community. For much the same reason, the use of the proposed building to provide ministerial, faith-based counseling to congregants is reasonably closely related to the public worship use of the building.[15] See, e.g., *Church of the Saviour v Tredyffrin Twp Zoning Hearing Bd*, 130 Pa Cmwlth 542, 548; 568 A2d 1336 (1989) ("[C]ounseling is an integral part of the church's activities."). And so is use of the building to train ministers and to promulgate the teachings of the church through broadcasts and publication; these ac-

---

*Pacific Union*, the building at issue was a 40,000-square-foot five-state regional headquarters office complex that contained a relatively small worship room to be used only by building employees. In *Hayes*, the building at issue was not to be used for worship at all; it was located one-half block away from the church and its sanctuary.

[15] It is irrelevant whether counseling services are provided free or at reduced cost. Further, the record evidence, while slightly contradictory, heavily favors a conclusion that the services are provided on a donation basis.

tivities are designed and intended to effectively communicate to a wider audience the message that is regularly espoused at GLS's public worship services. See *Burlington Assembly of God v Florence Twp Zoning Bd of Adjustment*, 238 NJ Super 634, 642; 570 A2d 495 (1989) (concluding that the operation of a church's radio station is a religious activity). As the record in this case demonstrates, all these activities and uses are relatively commonplace among churches in the area and elsewhere.

The same is not true of GLS's health ministry "co-op" activities, whereby GLS buys bulk amounts of various products for distribution to its members. However, this does not necessarily mean that the health ministry is unrelated to GLS's public worship purpose. To the contrary, this activity flows directly from the unique reason for GLS's existence as a church in the first place, i.e., to accommodate the chemical sensitivities and allergies of its members. By operating its health ministry, GLS asserts that it provides a much-needed service to its members in a fashion otherwise unavailable in today's society. Pastor Cheetham characterized the health ministry as a "spiritual service that is essential to the well-being of the members" and part of the GLS mission to "teach and practice the health and nutritional principles as revealed in the Holy Scriptures . . . ." Compare *Shim v Washington Twp Planning Bd*, 298 NJ Super 395, 408; 689 A2d 804 (1997) (daycare centers considered part of a spiritual mission because they provided a valuable community service, even though they did not necessarily advance religious teachings). We cannot conclude that the health ministry does not strengthen GLS as a community in its worship and otherwise. See *Bates*, 1 NY2d at 453. Further, the health ministry generates a net positive flow of revenue that helps to support GLS in its public worship and

other endeavors. In this regard, it is similar to quasi-commercial ventures that the record demonstrates are occurring in other area churches to raise money for various causes. Thus, the health ministry use of the proposed building is not so far afield from its public worship purpose, nor so extensive,[16] that it would undermine its status as a church.

In sum, we conclude that, under the correct legal analysis, the record here does not support the ZBA's determination that the proposed GLS building is not a church for purposes of the Township's ordinance. Accordingly, as a church, GLS could qualify for an SUP to construct its building, assuming that a variance should have been granted for the location GLS proposed.

### B. DENIAL OF THE VARIANCE

GLS next argues that the ZBA improperly denied its request for a variance allowing it to construct its church on the Cheetham property. The trial court did not review this decision, reasoning that, because the GLS building is not a church, it could not qualify for the variance sought. Nonetheless, because this issue was fully briefed in the trial court, this Court's review of any trial court decision on GLS's appeal of the denial would be de novo, *Norman Corp v East Tawas*, 263 Mich App 194, 198; 687 NW2d 861 (2004), and since the record is adequate for our review, we will consider this issue,

---

[16] We note that, after concluding that the buildings used for the camp meetings at issue in *Portage* were not a "church" under the dictionary definition of that term, as discussed earlier, our Supreme Court noted that those meetings were very noisy from early morning until extremely late at night and thus caused disturbance to neighbors. *Portage*, 318 Mich at 700. In contrast, the record here shows that the health ministry would involve nothing more than occasional deliveries by truck and customer activities during daytime hours.

*Peterman v Dep't of Natural Resources*, 446 Mich 177, 183; 521 NW2d 499 (1994).

GLS's first argument arises from the fact that the ordinance was amended during the time between its initial application and when the Township made its decision to deny that application. Before the amendment, the zoning ordinance included only a general 200-foot minimum width requirement; the amendment specified that the 200-foot length must be on an adjoining street for access.[17] GLS argues that it could have satisfied the general 200-foot minimum width require-

---

[17] At the time GLS filed each of its SUP applications, Georgetown Charter Township Zoning Ordinance, § 20.4(E) imposed the following site requirements for the construction of churches in residential districts:

(1) Minimum lot width shall be two hundred (200) feet.

(2) Minimum lot area shall be two (2) acres; plus an additional fifteen thousand (15,000) square feet for each one hundred (100) seating capacity or fraction thereof in excess of one hundred (100).

(3) The property location shall be such that at least one (1) property line abuts and has access to a collector, major arterial, or minor arterial streets.

As amended, § 20.4(E) imposes the following site requirements for churches constructed in residential districts:

(1) Minimum lot area shall be two (2) acres; plus an additional fifteen thousand (15,000) square feet for each one hundred (100) seating capacity or fraction thereof in excess of one hundred (100).

(2) The property location shall be such that at least one (1) property line with a minimum lot width of two hundred (200) feet abuts and has access to a collector, major arterial, or minor arterial street.

The Township began the process of amending § 20.4(E) on January 13, 2003, in order "to clarify" the ordinance requirements to clearly comport with the longstanding intention of the Township that churches constructed in residential districts have a minimum of 200 feet of frontage on a major street. Township representatives explained that the filing of

ment and that it should not be subject to the amended version of the ordinance. We disagree.

As this Court explained in *Landon Holdings, Inc v Grattan Twp*, 257 Mich App 154, 161; 667 NW2d 93 (2003):

> In determining which version of a zoning ordinance a court should apply, " 'the general rule is that the law to be applied is that which was in effect at the time of decision.' " *MacDonald Advertising Co v MacIntyre*, sub nom *MacDonald Advertising Co v City of Pontiac*, 211 Mich App 406, 410; 536 NW2d 249 (1995), quoting *Klyman v City of Troy*, 40 Mich App 273, 277; 198 NW2d 822 (1972); *Lockwood v Southfield*, 93 Mich App 206, 211; 286 NW2d 87 (1979).
>
> There are two exceptions to the general rule: (1) "A court will not apply an amendment to a zoning ordinance where . . . the amendment would destroy a vested property interest acquired before its enactment . . ."; and (2) a court will not apply the amendment where "the amendment was enacted in bad faith and with unjustified delay." *Lockwood, supra* at 211, citing *City of Lansing v Dawley*, 247 Mich 394, 396; 225 NW 500 (1929), and *Keating [Int'l Corp v Orion Twp*, 395 Mich 539, 549; 236 NW2d 409 (1975)]. . . . "[T]he test to determine bad faith is whether the amendment was enacted for the purpose of manufacturing a defense to plaintiff's suit." *Id.*

In *Klyman*, 40 Mich App at 279, this Court identified several factors to be considered when exercising discretion to admit or deny evidence of an amended ordinance: (a) whether the plaintiff had an unquestionable right to issuance of a permit before the amendment, (b) whether the municipality had not forbidden the type of construction the plaintiff proposed before the amendment, (c) whether the ordinance was amended for the

---

GLS's first application for an SUP presented the first occasion for the Township to observe that there may have been an ambiguity in this section as originally enacted.

purpose of manufacturing a defense to the plaintiff's suit, and (d) whether the city waited until the last possible minute to assert the defense. Similarly, in *Lockwood,* 93 Mich App at 211, this Court reiterated the general rule that the law to be applied is that in effect at the time of the zoning decision, subject to the exception that a court will not apply an amendment of a zoning ordinance if the amendment was "enacted for the purpose of manufacturing a defense to plaintiffs' suit." The Court noted that, in the case before it, there was evidence indicating that the amendment was intended to clarify an ambiguous ordinance and that the amendment did not apply only to the plaintiffs' property, but applied to all like structures throughout the city. Thus, this Court concluded that the trial court did not abuse its discretion in holding that the amendment was not enacted in bad faith. *Id.* at 212.

While these cases address amendment of a zoning ordinance during the pendency of litigation, and the instant ordinance was amended before the onset of litigation, they instruct that the bad faith exception does not apply to the township's February 2003 amendment of § 20.4(E) under the facts presented. The record shows that all but three of the 37 churches within the Township, each located there before the ordinance was amended, either comply with the 200-foot street frontage requirement or were granted a variance from that requirement. The three exceptions were constructed decades ago, and two have more than 150 feet of street frontage. That lends great credibility to other record evidence indicating that the intent of the ordinance was always to require 200 feet of street frontage, that the GLS application alerted zoning authorities within the Township to the need for a clarifying amendment, and that the amendment was merely intended to provide that clarification, not to concoct a reason to deny GLS's

application. See *McDonald Advertising Co v McIntyre,* 211 Mich App 406, 411; 536 NW2d 249 (1995) ("After reviewing the facts in this case, it is clear that the amendment was not enacted for the purpose of manufacturing a defense to plaintiff's suit."). Further, the amendment does not apply only to GLS; it governs the use of property throughout the Township. *Id.*; accord *Landon Holdings,* 257 Mich App at 162; *Lockwood,* 93 Mich App at 212; *Klyman,* 40 Mich App at 279. Accordingly, the zoning authorities properly applied the ordinance as requiring a variance from the 200-foot street frontage requirement.

Having determined that the amended requirements of § 20.4(E) apply here, this Court reviews the ZBA's decision to deny GLS a variance from those requirements to determine whether it is supported by competent, material, and substantial evidence on the record. MCL 125.3606(1)(c); *Norman,* 263 Mich App at 202. As noted, the 200-foot frontage requirement has been imposed on churches in the Township almost universally. The record further shows that the only variance granted was for a church having much longer frontage than the 66 feet available to the GLS parcel here.[18] The Township's planning consultant testified regarding the rationale for the 200-foot minimum requirement:

> The purpose of the requirement is to insure adequate sight distance for traffic entering and exiting the site, to provide sufficient spacing between access points and adjacent property lines and driveways, to minimize confusion with regard to multiple driveways within a limited distance, to provide reasonable vehicle stacking space in front

---

[18] As discussed previously, that church also had frontage on two arterial roads, thus distributing the traffic in a manner so as to, perhaps, reduce the traffic concerns that might otherwise have arisen from that site having less than the required frontage.

of the church property, to minimize conflicts with adjacent driveways with vehicles turning left into the site.

The planner reasoned that, while these issues might certainly arise even with the limited membership of the GLS congregation today, they could be exacerbated if GLS grows, as hoped and expected, or if another church takes over the property in the future.

In sum, the decision not to grant GLS a variance was based on the large deviation requested, the purposes of the 200-foot requirement, and the traffic and public safety issues that could result from allowing GLS to establish a church on this parcel of property. As the planner further testified, the denial was justified by ordinance provisions specifying the criteria on which variance requests are to be considered. We conclude that the decision was based on competent, material, and substantial evidence and affirm that decision.

### C. GLS's RLUIPA CLAIM

The "substantial burden" provision of RLUIPA provides in relevant part that

[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest. [42 USC § 2000cc(a)(1).]

Although the trial court determined that the Township had correctly concluded that the proposed GLS building was not a church, it nonetheless also held that

the Township had violated the RLUIPA in applying its ordinance to prevent the location of the proposed building at the location where GLS wanted to build it.[19] Specifically, the trial court determined that implementation of the ordinance placed an improper "substantial burden" on GLS's right to exercise its religion. 42 USC 2000cc(a).[20]

After the trial court issued its decision in this regard, our Court decided *Shepherd Montessori Ctr Milan v Ann Arbor Charter Twp (On Remand)*, 280 Mich App 449; 761 NW2d 230 (2008). That case is dispositive of the issue presented.[21] In *Shepherd Montessori*, this Court reasoned:

---

[19] To the extent that this determination was based on the Township's failure to consider the proposed building a church, questions regarding that decision have become moot because of our conclusion that it is a church. The same is the case for the constitutional claims discussed below. Thus, we consider the statutory question and the constitutional claims only with regard to the denial of the variance.

[20] To the extent that GLS argues that the RLUIPA was also violated because the Township's implementation of its ordinance "treat[ed] a religious assembly or institution on less than equal terms with a nonreligious assembly or institution," 42 USC 2000cc(b)(1), we consider that argument to be improperly preserved for appeal and improperly argued because it was presented without citation of any authority other than mere references to the RLUIPA. A party may not merely announce a position and leave it to this Court to discover and rationalize the basis for the claim or to search for authority to sustain or reject that party's position. *Goolsby v Detroit*, 419 Mich 651, 655 n 1; 358 NW2d 856 (1984); *In re Toler*, 193 Mich App 474, 477; 484 NW2d 672 (1992). Further, the gist of the argument is that the Township's zoning scheme treats churches less favorably than some commercial enterprises, but, as a matter of fact, that is not the case. Most of the commercial enterprises about which GLS complains are completely prohibited from locating in residential zoning districts. The imposition of certain conditions, like the 200-foot street frontage requirement, on churches that want to locate in residential districts certainly does not treat them less favorably in comparison with others that are simply excluded altogether.

[21] Although *Shepherd Montessori* involved a religious school rather than a church, we see no logical distinction between those uses of property for purposes of the RLUIPA and its "substantial burden" provision.

[T]o establish a RLUIPA violation, plaintiff must show that the denial of the variance request "coerces" individuals into acting contrary to their religious beliefs. Plaintiff did not show that the denial of the variance forces plaintiff to do something that its religion prohibits, or refrain from doing something that its religion requires. Plaintiff did not allege that the property at issue has religious significance or that plaintiff's faith requires a school at that particular site. Rather, the evidence suggests that . . . plaintiff *could* operate its school at another location in the surrounding area . . . . In other words, plaintiff may operate a faith-based school, but it must do so on property that is zoned for schools. . . . [T]he denial of the variance does not constitute a substantial burden on plaintiff's religious exercise and, therefore, the trial court correctly granted summary disposition to defendants on the RLUIPA claims. [*Id.* at 455 (citations omitted; emphasis in original).]

Similarly, the record demonstrates that GLS could locate a church at some other location within the Township as long as the property chosen has a 200-foot street frontage and otherwise complies with the ordinance. Failing that, if the alternative property more closely complies with the ordinance requirement, it could qualify for a variance. GLS makes no argument whatsoever that the particular parcel of property on which it would like to place the facility has any religious significance or is otherwise unique in any way. Accordingly, implementation of the ordinance against GLS's use of this particular piece of property does not constitute a substantial burden under the RLUIPA, and we reverse the decision of the trial court.

### D. GLS'S CONSTITUTIONAL CLAIMS

The Township argues that the trial court erred by determining that its application of the ordinance to reject GLS's proposed building plan was in violation of the rights of GLS's members to freely exercise their

religion, to freely associate, and to be afforded equal protection under the United States and Michigan constitutions.[22] The trial court decided that GLS had not been afforded its rights under these three constitutional theories largely on the basis of its determination that the RLUIPA had been violated. Because we have determined that the RLUIPA was not violated, that reasoning cannot serve as a basis for concluding that the constitutional claims GLS raises are valid.[23] Instead, we turn to an analysis of each of those claims under applicable caselaw.

This Court reviews constitutional questions de novo. *Dep't of Transportation v Tomkins*, 481 Mich 184, 190; 749 NW2d 716 (2008). Likewise, we review challenges to the constitutionality of a zoning ordinance de novo on appeal. *Scots Ventures, Inc v Hayes Twp*, 212 Mich App 530, 532; 537 NW2d 610 (1995).

We begin our analysis by noting that, with respect to GLS's constitutional claims concerning free exercise and equal protection, there are no significant differences between the Michigan and United States constitutions with regard to the rights afforded or their interpretation. *Advisory Opinion re Constitutionality of 1970 PA 100*, 384 Mich 82, 105; 180 NW2d 265 (1970) (Free Exercise Clause); *Neal v Oakwood Hosp Corp*, 226 Mich App 701, 716; 575 NW2d 68 (1997) (Equal Protection Clause). Further, the freedom of association claim arises solely out of the United States Constitution; it

---

[22] In response, GLS goes to great lengths to describe the religious hostility, animus, and discriminatory intent of various township officials. All of that argument applies to the decision that GLS is not a church, however, so it is inapposite to this Court's review of GLS's claims that its constitutional rights were violated with respect to the variance decision.

[23] We express no opinion regarding the propriety of the trial court's approach or its assumption that, if the RLUIPA was violated, so was the constitution with respect to these rights.

has not been recognized as a right under the Michigan Constitution. Accordingly, we analyze these questions largely on the basis of federal precedents.

The Free Exercise Clause does not relieve an individual from the obligation to comply with neutral laws of general applicability. *Employment Div, Dep't of Human Resources of Oregon v Smith*, 494 US 872, 878-879; 110 S Ct 1595; 108 L Ed 2d 876 (1990). A law is neutral if, both on its face and in its implementation, its object is something other than the infringement or restriction of religious practices. *Church of the Lukumi Babalu Aye, Inc v City of Hialeah*, 508 US 520, 533; 113 S Ct 2217; 124 L Ed 2d 472 (1993); *Grace United Methodist Church v City Of Cheyenne*, 451 F3d 643, 649-650 (CA 10, 2006). The record in this case amply demonstrates that neither the ordinance requirement that the parcel have 200 feet of frontage on a major street nor the decision to deny GLS a variance from that requirement runs afoul of the Free Exercise Clause under these principles. Instead, the record demonstrates that the street frontage requirement and its imposition on GLS was a valid exercise of a generally applicable scheme to accommodate competing interests within the Township, traffic issues, and other community concerns. See, e.g., *Village of Euclid v Ambler Realty Co*, 272 US 365; 47 S Ct 114; 71 L Ed 303 (1926).

Freedom of association claims like those GLS raises are tested under a three-part analysis: A zoning ordinance does not violate the United States Constitution if it (1) is content neutral, (2) is narrowly tailored to serve a legitimate governmental objective, and (3) leaves open ample channels of alternative means of association. *Ward v Rock Against Racism*, 491 US 781, 791; 109 S Ct 2746; 105 L Ed 2d 661 (1989); *Mothershed v Supreme Court Justices*, 410 F3d 602, 611-612 (CA 9, 2005). The

200-foot street frontage requirement satisfies this test. It applies to all churches regardless of the message they espouse and is, therefore, content neutral. There is no apparent manner, and GLS suggests none, in which the ordinance might be more narrowly tailored to meet the valid traffic and other purposes that the record demonstrates it advances. As explained earlier, the ordinance leaves open other channels for GLS to exercise its right to associate, on other parcels of property within the Township.

The equal protection clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v Cleburne Living Ctr, Inc,* 473 US 432, 439; 105 S Ct 3249; 87 L Ed 2d 313 (1985). Accordingly, the first question has to be whether GLS demonstrated on the record that it was treated differently from some similarly situated church. See *Shepherd Montessori Ctr Milan v Ann Arbor Charter Twp,* 259 Mich App 315, 336-337; 675 NW2d 271 (2003). With respect to the variance request, the record here shows that all churches within the Township have been treated alike. Almost all have been allowed only on parcels of property that have a 200-foot street frontage. The few exceptions have a street frontage available that is much closer to that requirement, in comparison to the parcel on which GLS sought to locate its proposed building. Therefore, GLS has failed to show that it has been treated differently from any similarly situated church.

In sum, we conclude that the trial court erred in determining that these three constitutional claims were valid under the facts of this case.

We reverse the trial court's decision affirming the ZBA conclusion that the proposed building is not a church under the zoning ordinance. We affirm the

decision of the ZBA denying GLS's variance request. We remand for entry of an order granting defendants summary disposition of GLS's statutory and constitutional claims. We do not retain jurisdiction.