*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RICK BUCKHALTER,

      Plaintiff-Appellee,

v

CITY OF TRAVERSE CITY,

      Defendant-Appellant,

and

GREAT LAKES FISHERY COMMISSION,

      Intervening Defendant.

UNPUBLISHED
October 20, 2022

No. 357216
Grand Traverse Circuit Court
LC No. 2020-035540-AW

RICK BUCKHALTER,

      Plaintiff-Appellee,

v

CITY OF TRAVERSE CITY,

      Defendant,

and

GREAT LAKES FISHERY COMMISSION,

      Intervening Defendant-Appellant.

No. 357254
Grand Traverse Circuit Court
LC No. 2020-035540-AW

Before: MARKEY, P.J., and SAWYER and BOONSTRA, JJ.

PER CURIAM.

These consolidated appeals[1] concern plans to modify and improve the Union Street Dam in Traverse City, including the addition of an experimental system for managing fish passage upstream. In Docket No. 357216, defendant, City of Traverse City (the City), appeals by right the trial court's order denying its motion for summary disposition, granting plaintiff's motion for summary disposition under MCR 2.116(I)(2), and enjoining the City from proceeding with its plans without an affirmative vote of the city electorate pursuant to the Traverse City Charter. In Docket No. 357254, intervening defendant, Great Lakes Fishery Commission (GLFC), appeals by right the same order. We reverse and remand for entry of an order summarily dismissing plaintiff's lawsuit.

I. BACKGROUND

At issue in this dispute is a public park (the Property) owned and controlled by the City. Ownership of the Property, portions of the Property, and land abutting the Property has changed hands many times over the years through various conveyances, including transactions involving utilities, but the Property is now owned by the City. The Property contains the Union Street Dam (the Dam), an approximately 250-foot-long earthen embankment dam constructed in 1867. In 1955 and 1965, the Dam was upgraded to provide improved control over the level of Boardman Lake. In 1987, a "fish ladder" was added to the Dam; this passage is six feet wide, 75 feet long, and made of concrete. The purpose of a fish ladder is to allow desirable fish to proceed upstream while restricting undesirable fish. The Dam currently contains three water passing structures: a principal spillway, an auxiliary spillway, and the fish ladder. The Dam is presently used to control the level of Boardman Lake, provide a barrier to the passage of invasive species such as the sea lamprey up the Boardman River, and to prevent flooding.

The City engaged with various third parties to improve and modify the Dam via a project called the "FishPass" project (the Project). The Project would upgrade the Dam and add a new and experimental system for managing fish passage upstream. The goal of the Project is to find a better method for allowing desirable fish to swim upstream while restricting undesirable fish from doing so. Although the Project would lead to an increase in the overall size of the Dam, the Project would also add more parkland for use by the public, more usable shoreline, and more facilities and amenities. The Project is part of the "Boardman River Restoration Project," which has been ongoing for approximately 20 years and involves other dams along the river. The research elements of the Project would last for 10 years, at which time the City could choose to opt out of the experimental research.

Plaintiff challenged the Project on the basis that the Property is a city park and that pursuant to certain sections of the Traverse City Ordinances (TCO), the Project required a vote of approval by city electors. The relevant ordinance sections provide:

---

[1] *Buckhalter v Traverse City*, unpublished order of the Court of Appeals, entered June 7, 2021 (Docket Nos. 357216; 357254).

The City shall not sell, exchange, lease or in any way alien or dispose of the property, easements, income or other equipment, privilege or asset belonging to and appertaining to any utility which it may acquire, or its parks, unless and except the proposition for such purpose shall first have been submitted, at a regular or special election held for the purpose in the manner provided in this Charter, to the qualified voters of the City and approved by them by a three-fifths (3/5) majority vote of the electors voting thereon. All contracts, negotiations, grants, leases or other forms of transfer in violation of this provision shall be void and of no effect as against the City. The provisions of this section shall not, however, apply to the sale or exchange of any real estate which is not necessary to the operation of any utility or utility department or any articles or equipment of any City owned utility as are worn out or useless, or which could, with advantage to the service, be replaced by new and improved machinery or equipment.  [TCO, § 126.]

* * *

The City shall possess and hereby reserves to itself the right to use and to control and regulate the use of its streets, alleys, bridges and public places, and the space above and beneath them, and shall have the power to acquire, own, establish, maintain, operate and administer, either within or without its corporate limits, parks, boulevards, cemeteries, hospitals, almshouses, buildings and all works which involve the public health or safety.  [TCO, § 127.]

* * *

All grants or dedications heretofore made shall continue without change. All cemeteries and parks now owned or hereafter acquired by the City of Traverse City either within or without its corporate limits shall be dedicated solely to cemetery or park purposes respectively, provided, however, that the electors by a three-fifths (3/5) majority vote may approve subsequently disposal of such cemeteries and parks or portions thereof.  [TCO, § 128.[2]]

The City did not dispute that no vote had occurred on the Project under these provisions. The City contended, however, that no vote was needed under the circumstances.  Plaintiff sought a preliminary injunction to enjoin the City from moving forward with the Project until a vote of the electorate was held.  After the trial court granted the preliminary injunction, defendants[3] moved for summary disposition.  Defendants argued that in order for the cited sections of the TCO to apply, the park needed to be a legally dedicated park.  Given that the Property was not a legally dedicated city park, the voting requirement was inapplicable according to defendants.

---

[2] We note that TCO, § 126 is included in Chapter XII of the TCO, which addresses "municipally owned utilities" (original in all caps), while TCO, §§ 127 and 128 are part of Chapter XIII of the TCO, which concerns "streets, public grounds and property, cemeteries, parks, trusts" (original in all caps).

[3] For ease of reference, the City and GLFC will be referred to collectively as "defendants."

Alternatively, defendants maintained that the voting requirement was inapplicable because no park property, or portion thereof, had been or will be disposed of as part of the Project. Defendants also contended that the Property's use for park purposes does not change as a result of the Project. Plaintiff opposed defendants' motion and requested that summary disposition be instead granted in his favor.

The trial court granted summary disposition in favor of plaintiff under MCR 2.116(I)(2). The trial court first determined that the Property did not need to be a dedicated park in order for the voting requirement to apply. The trial court further ruled that the Project involves a *disposition* of park property. Finally, the trial court found that the Project entails a change in the use of the Property as a park because the research elements of the Project do not constitute a valid park purpose. Therefore, the trial court ruled that the TCO voting requirement applied. Defendants had also raised an argument concerning laches, contending that plaintiff had waited too long to bring his action and that the delay was causing tremendous financial cost to the City. The trial court rejected this argument, concluding that there was no significant delay. Accordingly, the trial court ruled that plaintiff was entitled to summary disposition.

## II. ANALYSIS

### A. UNDERLYING LEGAL PRINCIPLES

This Court reviews de novo the interpretation and application of municipal ordinances, *Great Lakes Society v Georgetown Charter Twp*, 281 Mich App 396, 407; 761 NW2d 371 (2008), as well as a trial court's decision on a motion for summary disposition, *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

In *Great Lakes Society*, 281 Mich App at 407-408, this Court addressed the construction of ordinances, observing as follows:

> Ordinances are treated as statutes for the purposes of interpretation and review. . . . The goal of statutory construction, and thus of construction and interpretation of an ordinance, is to discern and give effect to the intent of the legislative body. Terms used in an ordinance must be given their plain and ordinary meanings . . . . [Citations omitted.]

When the language of an ordinance is clear and unambiguous, it "must be enforced as written." *Kalinoff v Columbus Twp*, 214 Mich App 7, 11; 542 NW2d 276 (1995). If a term in a statute is undefined, it is proper to consult a dictionary definition in assessing the word's plain and ordinary meaning. *Halloran v Bhan*, 470 Mich 572, 578; 683 NW2d 129 (2004).

The trial court examined and considered documentary evidence in rendering its decision, thereby implicating MCR 2.116(C)(10). And in *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013), this Court set forth the principles governing an analysis under MCR 2.116(C)(10):

> In general, MCR 2.116(C)(10) provides for summary disposition when there is no genuine issue regarding any material fact and the moving party is entitled

to judgment or partial judgment as a matter of law. A motion brought under MCR 2.116(C)(10) tests the factual support for a party's claim. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). A court may only consider substantively admissible evidence actually proffered relative to a motion for summary disposition under MCR 2.116(C)(10). [Citations and quotation marks omitted.]

"If it appears to the court that the opposing party, rather than the moving party, is entitled to judgment, the court may render judgment in favor of the opposing party." MCR 2.116(I)(2).


## B. DISCUSSION AND RESOLUTION

We shall proceed on the assumption that the voting provisions contained in TCO, §§ 126 and 128 are potentially implicated in this case even if the Property was not established by dedication or is not considered a dedicated park. TCO, § 126 provides, in relevant part, that "[t]he City shall not *sell, exchange, lease* or in any way *alien or dispose* of . . . its parks, unless and except the proposition for such purpose shall first have been submitted . . . to the qualified voters of the City and approved by them by a three-fifths (3/5) majority vote[.]" (Emphasis added.) And TCO, § 128 states, in pertinent part, that parks "shall be dedicated solely to . . . park purposes . . ., however, . . . the electors by a three-fifths (3/5) majority vote may approve . . . *disposal* of . . . parks or portions thereof." (Emphasis added.)

There is no evidence that the Project involves selling, exchanging, leasing,[4] or alienating[5] the Property. The City retains ownership of the Property throughout the duration of the Project. Authorizations to perform work or research on the Property do not entail the sale of the Property, an exchange of the Property, the leasing of the Property, or the alienation of the Property. At most, they convey a simple license. See *McCastle v Scanlon*, 337 Mich 122, 133; 59 NW2d 114 (1953) ("A license is a permission to do some act or series of acts on the land of the licensor without having any permanent interest in it.") (Quotation marks and citations omitted.) On the other hand,

---

[4] To "lease" means "[t]o grant the possession and use of (land, buildings, rooms, movable property, etc.) to another in return for rent or other consideration < the city leased the stadium to the football team>." *Black's Law Dictionary* (7th ed). The Property is not leased to any person or entity under the Project.

[5] To "alienate" means "[t]o transfer or convey (property or a property right) to another." The Project does not entail the transference or conveyance of the Property.

-5-

the act of *disposing* of a park, in our view, has a broader reach than the other ordinal verbs. In relevant part, to "dispose" of something means "to transfer to the control of another," but it can also mean "to get rid of." *Merriam-Webster's Collegiate Dictionary* (11th ed). We opine that a park can be disposed of without conveying, transferring, deeding, or otherwise relinquishing the park to another. For example, if a municipality owned a park that consisted of playground equipment and a few picnic tables, and then the municipality removed the playground equipment and picnic tables and constructed an office building on the site while retaining full ownership of the property, a reasonable characterization would be that the municipality *disposed* of a public park. The property indisputably would no longer be used for park purposes given the presence of the office building and the removal of park paraphernalia.

In this case, as opposed to our example, the Property continues to be used for valid park purposes under the Project. There will be no meaningful deviation in the usage of the Property as a park such that a vote of the electorate is necessary to execute the Project. Both the current use of the Dam and its planned use under the Project regulate lake levels, control flooding, and aim to control the passage of fish. The Dam is a large, concrete structure, and it has already been improved in the past to add a fish ladder. The Project involves the enlargement of the existing Dam and the employment of a new method to manage fish passage. The goals of the Project are simply to better regulate the lake, better mitigate flooding, and better control fish passage; the nature of the Property remains the same. Although the Project contains extensive research elements, Daniel P. Zielinski, the principal engineer and scientist for GLFC, affirmed in an affidavit that fish research and management had already been conducted on the Property for many years, that the Project was consistent with other research and management projects at other state parks, and that the two activities were intertwined and could not be separated.

Furthermore, the Project is not limited to mere improvement of the Dam and research purposes. As part of the Project, the shoreline accessible to the public is to be increased approximately 500 feet, whereas the current shoreline is mostly hardened concrete and not as accessible. Similarly, the Project will lead to an approximate increase in parkland of 66 percent. And more amenities and facilities are to be added. Therefore, the Project will result in a net gain of parkland and *more* public use. The Property will remain a park under the Project.

The trial court based its decision largely on the Project's research elements, but occupying space on the Property for purposes of conducting research related to the passage of fish, which matter has been part of the operation of the Dam and a characteristic of the Property since the addition of the fish ladder in 1987, does not transform the park into something other than a park. Moreover, engaging in environmental research concerning the habitat of species found in the area has a natural connection to the Property's purpose and use as a park.

If parkland was used to conduct research wholly unrelated to the operation of the park, it might be arguable that the voting requirements of TCO, §§ 126 and 128 would be triggered. But that is plainly not the situation in this case. Furthermore, the trial court essentially ignored the planned improvements to the existing Dam as well as to the park itself. In sum, the trial court erred by ruling that TCO, §§ 126 and 128 require a vote of approval by the electors before the City can move forward with the Project.

We reverse and remand for entry of an order summarily dismissing plaintiff's complaint. We do not retain jurisdiction. Having fully prevailed on appeal, defendants may tax costs under MCR 7.219.

/s/ Jane E. Markey
/s/ David H. Sawyer
/s/ Mark T. Boonstra