# STATE OF MICHIGAN

# COURT OF APPEALS

GRANDVIEW BEACH ASSOCIATION,

      Plaintiff-Appellant,

v

COUNTY OF CHEBOYGAN and CHEBOYGAN
COUNTY PLANNING COMMISSION,

      Defendants-Appellees,

and

HERITAGE COVE FARM, INC., LAWRENCE
P. HANSON, ELIZABETH A. HANSON, and
LIB LIB, LLC,

      Intervenors-Appellees.

UNPUBLISHED
January 16, 2018

Nos. 335159; 335206
Cheboygan Circuit Court
LC No. 16-008566-AA

Before: O'CONNELL, P.J., and HOEKSTRA and SWARTZLE, JJ.

PER CURIAM.

Plaintiff, Grandview Beach Association, appeals a circuit court order affirming the decision of defendant, Cheboygan County Planning Commission (the Commission), to grant a special use permit to intervenors, Heritage Cove Farm, Inc. (the Farm), Lawrence P. Hanson, Elizabeth A. Hanson, and Lib Lib, LLC. For the reasons explained in this opinion, we affirm.

## I. BACKGROUND

Intervenors requested a special use permit and site plan approval for a proposed development known as Heritage Cove Farm in April 2015. Intervenors presented the Farm as a "therapeutic farm community" for residents with mental illnesses that "substantially affect" one or more major life activity. For a fee, the Farm will provide room and board as well as farming opportunities and other activities in a community setting that is designed to enable residents to "work toward healing and living independently." The Farm will have 24-hour on-site staffing to provide medication reminders, treatment plans with onsite staff, as well as individual and group therapy. It is expected that residents will remain on the farm for 4 to 12 months. The proposed

-1-

site plan for the property includes cabins to house residents and staff, a garden, a greenhouse, space for animals, a workshop and storage area, and a community building with dining facilities.

The Farm property consists of 33 acres and it spans two zoning districts, M-AF (Agricultural and Forestry Management), and P-LS (Lake and Stream Protection). Discussion and deliberation took place regarding the proposed development, both between the Commission's staff and intervenors, and in the form of voluminous public comments. The Commission held a public hearing on November 4, 2015, and deliberations on December 2, 2015, December 16, 2015, and January 6, 2015. After reviewing exhibits, staff reports, and correspondence, the Commission approved, with conditions, intervenors' application for a special use permit for the Farm as a convalescent home in the M-AF zoning district, and as cabin colonies and a restaurant in the P-LS zoning district. Plaintiff appealed the Commission's decision to the circuit court, which affirmed that decision.

## II. STANDARD OF REVIEW

This Court reviews de novo a circuit court's decision in an appeal from a zoning decision. *Edw C Levy Co v Marine City Zoning Bd of Appeals*, 293 Mich App 333, 340; 810 NW2d 621 (2011). Courts must affirm a zoning decision unless the decision is contrary to law, based on improper procedure, unsupported by competent, material, and substantial evidence on the record, or was an abuse of discretion. *Id*. "Substantial evidence is evidence that a reasonable person would accept as sufficient to support a conclusion." *Id*. at 340-341 (quotation marks and citation omitted). This Court reviews de novo, as a question of law, whether an ordinance complies with the Michigan Zoning Enabling Act (MZEA), MCL 125.3101 *et seq*. *Whitman v Galien Twp*, 288 Mich App 672, 678; 808 NW2d 9 (2010).

This Court also reviews de novo questions involving the interpretation and application of statues, *Linden v Citizens Ins Co of America*, 308 Mich App 89, 91; 862 NW2d 438 (2014), and zoning ordinances, *Brandon Charter Twp v Tippett*, 241 Mich App 417, 421; 616 NW2d 243 (2000). When interpreting a statute, our goal is to give effect to the intent of the Legislature. *United States Fidelity & Guaranty Co v Mich Catastrophic Claims Ass'n (On Rehearing)*, 484 Mich 1, 13; 795 NW2d 101 (2009). The language of the statute itself is the primary indication of the Legislature's intent. *Id*. If the language of the statute is unambiguous, this Court must enforce the statute as written. *Id*. at 12-13. Ordinances are interpreted in the same manner that we interpret statutes. *Brandon Charter Twp*, 241 Mich App at 422.

## III. PERMITTED USES IN THE M-AF AND P-LS DISTRICTS

On appeal, plaintiff argues that defendants violated the MZEA by granting intervenors' special use permit application. According to plaintiff, defendants violated the MZEA by acting outside their authority by granting a special use permit for uses that are not allowed under the Cheboygan Zoning Ordinance. In particular, plaintiff asserts (1) that the Farm's proposed uses do not meet the criteria for a "convalescence home" permitted in the M-AF district and (2) that portions of the convalescence home, such as cabins and the dining facility, are located in the P-LS district, which does not allow for convalescence homes.

Municipalities have the authority to regulate land use through zoning only because the Legislature has granted them that authority in the MZEA. *Whitman*, 288 Mich App at 679. Thus, a municipality can exercise zoning authority "only to the limited extent authorized by that legislation." *Id*. The act provides that "regulations shall be uniform for each class of land or buildings, dwellings, and structures within a district." MCL 125.3201(2).

"The legislative body may provide in a zoning ordinance for special land uses in a zoning district." MCL 125.3502(1). See also *Whitman*, 288 Mich App at 680. The zoning ordinance must specify the special land uses eligible for approval, the requirements for approval, and the procedures used for review and approval of such uses. MCL 125.3502(1)(a) to (c). The special use standards must ensure that special uses are compatible with adjacent uses and are consistent with public health and safety. MCL 125.3504(2) provides:

> The standards shall be consistent with and promote the intent and purpose of the zoning ordinance and shall insure that the land use or activity authorized shall be compatible with adjacent uses of land, the natural environment, and the capacities of public services and facilities affected by the land use. The standards shall also insure that the land use or activity is consistent with the public health, safety, and welfare of the local unit of government.

The local body may deny, approve, or approve with conditions any request for approval of a special land use. MCL 125.3502(4).

Cheboygan County has promulgated procedures for the review and approval of special land uses. Cheboygan Zoning Ordinance, § 18.1 *et seq.*[1] The ordinance gives the Commission authority to review any special use request and approve, deny, or approve with conditions the special use permit. Cheboygan Zoning Ordinance, § 18.6. The ordinance provides that the Commission shall approve or approve with conditions a special use only if the special use complies with several requirements. Cheboygan Zoning Ordinance, § 18.7. The first requirement of the ordinance for granting a special use permit is that "[t]he property subject to the application is located in a zoning district in which the proposed special land use is allowed." Cheboygan Zoning Ordinance, § 18.7.a.

In this case, the Commission allowed intervenors' use of the property in the M-AF district as a convalescent home. The M-AF district includes "those areas where farming, dairying, forestry operations and other such rural-type activities exist and should be preserved or encouraged." Cheboygan Zoning Ordinance, § 9.1. A variety of uses are expressly permitted, including single-family dwellings, commercial farms, greenhouses and nurseries, and hobby farms. See Cheboygan Zoning Ordinance, § 9.2. In the M-AF district, nursing or convalescent homes are allowed by special use permit under Cheboygan Zoning Ordinance § 9.3.14. Convalescent homes are defined as "[a] home, qualified for license under applicable Michigan

---

[1] Unless otherwise stated, this opinion refers to the version of the ordinance in effect at the time of the Commission's decision.

Law, for the care of children, aged, or infirm and providing facilities for four or more patients." Cheboygan Zoning Ordinance, § 2.2.

On appeal, plaintiff argues that the Farm does not fall within this definition of "convalescent home." This argument lacks merit. Reviewing this question of ordinance interpretation de novo, *Great Lakes Soc v Georgetown Charter Twp*, 281 Mich App 396, 408; 761 NW2d 371 (2008), we conclude that the Commission did not commit an error of law in finding that the Farm constituted a "convalescent home."

First, with regard to the meaning of "infirm," the Cheboygan Zoning Ordinance does not define "infirm." Given that the term is undefined, it is appropriate to consult a dictionary to determine the common meaning of undefined terms. *Koontz v Ameritech Servs, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002). Dictionaries define "infirm," in pertinent part, as including "[w]eak in body or mind, especially from old age or disease," "weak of mind, will, or character" and "not physical or mentally strong, especially through age or illness." See *Merriam-Webster's Collegiate Dictionary* (11th ed); *The Oxford-American Dictionary* (3rd ed); *The American Heritage Dictionary of the English Language* (5th ed). Thus, dictionary definitions support the conclusion that to be "infirm" involves a mental or physical weakness caused by illness or age. The conclusion that the term "infirm" as used in the ordinance specifically encompasses mental weakness caused by illness is further supported by the context of the statute and our obligation to "give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory." *Johnson v Recca*, 492 Mich 169, 177; 821 NW2d 520 (2012) (citation and quotation marks omitted). The ordinance provides that a convalescent home is one "for the care of children, aged, *or* infirm[.]" Cheboygan Zoning Ordinance, § 2 (emphasis added). The word "or" is a disjunctive term that allows a choice between alternatives. *Michigan v McQueen*, 293 Mich App 644, 671; 811 NW2d 513 (2011), aff'd 493 Mich 135 (2013). If being "infirm" was merely a subset of being "aged," there would be no reason to include the word "infirm" in the statutory definition—it would be sufficient to state that a convalescent home is a home for the care of children or the aged. Therefore, we conclude that the Commission properly determined that a person may be infirm by reason of mental illness, and that a convalescent home may be a home designed to care for those infirm by reason of mental illness. Given this definition of "infirm" and the undisputed evidence that the Farm will have facilities to provide care for up to 24 mentally ill individuals, the Commission's conclusion that the Farm will provide care for more than four "infirm" patients was not an error of law.

Second, with regard to licensing, as noted, the ordinance defines a convalescent home as "[a] home, qualified for license under applicable Michigan Law . . . ." Plaintiff argues that the Farm does not satisfy this criterion of a "convalescent home" because the Farm will not be licensed. However, consistent with the ordinance, as a condition for issuing the special use permit, the Commission required the Farm to "[o]btain any and all licenses for the operation of Heritage Cove Farm . . . ." Relevant to the licensing requirement, Mahtina Rubritius of the Department of Licensing and Regulatory Affairs (LARA) indicated to the Commission that if the

Farm was run similar to Rose Hill,[2] it would be licensed as an adult foster care facility.[3] While Rubritius indicated that any licensing process could not take place without written local zoning approval, her letter supports a finding that the Farm would require a license. Accordingly, the record does not support plaintiff's argument that the Farm cannot be a convalescent home because it will not require a license.[4] Given these licensing requirements, the Commission did not commit an error of law in determining that the Farm constituted a "convalescent home."

Plaintiff next argues that even if the Farm is a convalescent home, parts of the Farm reside in the P-LS district, which does not allow convalescent homes. Plaintiff's argument lacks merit because, with regard to the P-LS district, the Commission only allowed cabin colonies and a restaurant, which are permitted by special use permit in that district.

In particular, the P-LS district includes all property within 500 feet of the high water mark of certain streams and bodies of water. Cheboygan Zoning Ordinance, § 10.1.2. The full list of expressly permitted uses in the P-LS district includes single-family dwellings, gardening, home occupations, and private storage buildings. Cheboygan Zoning Ordinance, § 10.2.1 to § 10.2.4. However, the P-LS district allows several uses by special use permit, including

---

[2] Rose Hill is a therapeutic farm for the mentally ill located in Holly, Michigan.

[3] Under MCL 400.713, "[a] person, partnership, corporation, association, or a department or agency of the state, county, city, or other political subdivision shall not establish or maintain an adult foster care facility unless licensed by [LARA]." " 'Adult foster care facility' means a governmental or nongovernmental establishment that provides foster care to adults," including "facilities and foster care family homes for adults who are aged, mentally ill, developmentally disabled, or physically disabled who require supervision on an ongoing basis but who do not require continuous nursing care." MCL 400.703. See also MCL 400.704(7); MCL 400.706(1); MCL 400.706(4); MCL 400.707(8).

[4] We note that, as an alternate to obtaining a license, the Commission indicated that the Farm could "provide letters or other written documentation from state and federal agencies that license facilities caring for the mentally ill or infirm that Heritage Cove Farm's proposed use does not require a license or licenses normally issued to facilities that care for the mentally ill and/or infirm." This remark suggests that licensing might not be required for the Farm and that, if no license is necessary, the Farm would nevertheless constitute a convalescence home. However, if no license is required by the State of Michigan, the Farm would not meet the definition of "convalescent home" under the ordinance. To constitute a convalescent home under the ordinance, the home must be "qualified for license under Michigan Law." Plainly, to be "qualified for license under applicable Michigan Law," there must be an applicable Michigan license and the home must qualify for that license. However, to the extent the Commission's opinion could be read to suggest that a facility which is not subject to licensing in Michigan can somehow be a "convalescence home," this error of law is of no significance because Rubritius's information as well as applicable statutes and the intervenors' description of the project make plain that licensing will be required for the Farm. See MCL 400.713; MCL 400.703; MCL 400.704(7); MCL 400.706(1); MCL 400.706(4); MCL 400.707(8).

campgrounds, cabin colonies, retail stores, marinas, golf courses, hotels and motels, multi-family buildings, bed and breakfasts, and restaurants and bars. Cheboygan Zoning Ordinance, § 10.3.[5]

The ordinance defines a cabin as "[a]ny building, tent or similar structure which is maintained, offered or used for dwelling or sleeping quarters for transients, or for temporary residence, but shall not include what are commonly designated as hotels, lodges, houses or tourist homes." Cheboygan Zoning Ordinance, § 2.2. In relevant part, the term "colony" is commonly defined to mean "a group of individuals or things with common characteristics or interests situated in close association." *Merriam-Webster's Collegiate Dictionary* (11th ed). The Farm's residents are to be housed in small cottages with no kitchen or eating areas. The cottages will be situated in clusters of four to six cabins each. The residents are not intended to live in the cabins on a permanent basis. Rather, they were expected to stay between 4 and 12 months. In other words, the cabins are structures used as sleeping quarters for temporary residents, and these groups of cabins are situated in close association. Given the nature of the proposed cabin clusters, we see no error of law in the Commission's conclusion that the groups of cabins constitute "cabin colonies" permitted by special use in the P-LS district.[6]

With regard to the community building, which contains a dining facility, the Commission concluded that the proposed use fell within the meaning of "restaurant" and that such a use is permitted in the P-LS district. The ordinance does not define "restaurant." As commonly understood, restaurant is defined as "a business establishment where meals or refreshments may be purchased," *Merriam-Webster's Collegiate Dictionary* (11th ed), or "a place where meals are prepared and served to customers," *Cambridge Dictionary* < http://dictionary.cambridge.org/dictionary/english/restaurant> (accessed December 20, 2017). In this case, the Farm will provide meals to the residents at the community building. There is no indication that meals will be provided for free. To the contrary, the undisputed evidence indicates that residents will be paying a fee to stay at the Farm and that this fee includes room and board. Thus, we conclude that the Commission did not violate the zoning ordinance by concluding that the community lodge constituted a restaurant allowed in the P-LS district.[7]

---

[5] At the time of the decision in this case, the ordinance allowed cabin colonies as § 10.3.3, but an amendment on October 13, 2016, removed cabin colonies as a permitted use. Neither the former nor present version of the ordinance defines "cabin colony."

[6] On appeal, plaintiff emphasizes that some of the cabins will be located in the M-AF district, and plaintiff argues that this is impermissible because the M-AF district does not allow for cabin colonies. However, the structures on the M-AF property, including cabins, are part of the "convalescence home." Nothing in the ordinance requires a "convalescence home" to be configured as a single building as opposed to several cabins. Consequently, the presence of cabins in the M-AF district does not undermine the Commission's determination that the proposed use meets the criteria for a convalescence home. And, as discussed a convalescence home is permitted in the M-AF district with a special use permit.

[7] To the extent that plaintiff argues that the lodge cannot be a restaurant because it does not have enough parking, we note that Cheboygan Zoning Ordinance, § 17.6 contains minimum parking

Although cabin colonies and restaurants are allowed in the P-LS district, plaintiff argues on appeal that they should not be permitted in this case because the cabins and restaurant are in actuality part of a convalescence home and a convalescence home is not permitted in the P-LS district. However, while it is true that the restaurant and cabins on the P-LS district will facilitate the convalescence operations in the M-AF district, this does not provide a basis for denying intervenors the ability to build cabins and a restaurant on the P-LS property as allowed in the P-LS district. See *Anchor Steel & Conveyor Co v Dearborn*, 342 Mich 361, 368; 70 NW2d 753 (1995). When an individual owns property in two neighboring zones, it would be "both unreasonable and arbitrary to deny [a party] the use of its property in each zone to the fullest extent of its capabilities because such use either facilitates or hampers the operations in still another zone." *Id.* Provided that a party "seeks merely to use [its] property for a use consistent with the restrictions imposed on each of the particular areas of that property by the zoning ordinance," a party may do so. *Id*. at 369. For example, in *Anchor Steel*, a single building was 75% in one industrial zone and 25% in another. *Id*. at 364. The property owner sought a permit to construct an addition for drafting operations and steel storage in one zone of the building that would be used to support manufacturing in another zone of the building. *Id*. at 365, 368-369. Our Supreme Court concluded that the plaintiff was entitled to use property in a way permitted in the zone the property resided in—provided that the uses were allowed in the zone they were in— to support uses in another zone. *Id*. at 368-369.

Similarly, in this case, the Commission looked at the proposed uses on each particular portion of intervenors' property and determined that the particular uses in each zone were authorized by the zoning ordinance. It is true that residents will be housed in cabins in both the M-AF district and the P-LS district and that the restaurant in the P-LS district will serve individuals being cared for at the convalescence home. However, the cabins in the P-LS zone do not stop being "cabins," which are permitted in the P-LS zone, simply because there are also cabins in the M-AF zone. Conversely, the cabins to house patients in the M-AF zone are no less a part of the convalescence home simply because there are also cabins in the P-LS zone. Further, while the community building will serve the residents of the convalescent home, it is nevertheless properly constructed in the P-LS zone because it meets the definition of "restaurant," and a restaurant is permitted in the P-LS zone. Cf. *id.*

---

space requirements for various facility types, including restaurants. However, these requirements apply *if* a building is a restaurant. These requirements do not define whether or not a building is a restaurant, and plaintiff has offered no authority for the proposition that whether or a not a building is a restaurant is based on how many parking spots are available. Parties abandon issues on appeal if they "merely announce their position and leave it to this Court to discover and rationalize a basis for their claims." *VanderWerp v Plainfield Charter Twp*, 278 Mich App 624, 633; 752 NW2d 479 (2008). Because plaintiff merely states this argument without explanation, it is not clear how a purported dearth of parking spaces would warrant reversing the Commission's findings. Further, the Commission explicitly determined that the use was a restaurant only "so long as such restaurant/cafeteria meets the special use and site plan criteria" under the Cheboygan Zoning Ordinance. If the ultimate community building did not meet the special use criteria, the Commission's decision would not allow it.

Overall, reviewing the matter de novo, we conclude that the circuit court did not err when it affirmed the Commission's determination that intervenors' proposed special uses were permitted in the M-AF and P-LS districts by the Cheboygan County Zoning Ordinance.

## IV. ACCOMMODATION REGARDING CHEBOYGAN ZONING ORDINANCE § 18.7.e

Next, plaintiff argues that the Commission's accommodation with respect to Cheboygan Zoning Ordinance § 18.7.e effectively invalidated the zoning ordinance by placing a medical therapy facility in a residential area.

Cheboygan Zoning Ordinance § 18.7.e requires that, before approving a special use permit, the Commission must find that a proposed special land use "will not place demands on fire, police, or other public resources in excess of current capacity nor increase hazards from fire or other dangers to the subject property or adjacent properties." With regard to this requirement, the Commission recognized that there were no reports from law enforcement or others regarding the burden that would be placed on emergency support personnel. However, as discussed by the Commission, there was testimony from a retired police officer regarding the likelihood of an increase in safety hazards and emergency room visits, a statement from a clinical psychologist espousing concern over possible safety issues, and evidence of a general study relating to the proportion of emergency room visits that are made by psychiatric patients. On this record, the Commission expressly found that intervenors had not made the showing required under 18.7.e, finding that the record "will *not* support standard 18.7.e" (emphasis added).

Despite this failing, the Commission conditionally granted a special use permit to intervenors. The Commission determined that "[b]ecause the sole reason for not meeting standard 18.7.e is because of the mental disability of the residents, a modification allowing this use is reasonable and necessary under [the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*, and the Fair Housing Act (FHA), 42 USC 3601 *et seq.*]." In particular, in an effort to accommodate the residents' mental disabilities, the Commission waived the requirement under 18.7.e as an initial matter and instead conditioned the special use permit on the requirement that intervenors request comment on the safety issues from the police department and sheriff's department. Additionally, in its findings, the Commission expressly stated that approval for the special use permit "should be conditioned on the results of a police, fire, and ambulance impact study to determine whether this standard [under § 18.7.e] has been met by" intervenors. The Commission also noted that even if there was some increased burden on law enforcement, it would not necessarily preclude the Commission from granting the special use permit because intervenors were entitled to reasonable accommodation.

Both the ADA and FHA apply to municipal zoning decisions. *Pacific Shores Props, LLC v Newport Beach*, 730 F3d 1142, 1157 (CA 9, 2013). Congress enacted the ADA in part "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 USC 12101(b)(1). The ADA recognizes that discrimination against people with disabilities persists in areas such as housing. 42 USC 12101(a)(3). Disabilities include mental impairments that substantially limit one or more major life activities. 42 USC 12102(1)(a). The FHA prohibits discrimination in housing on the basis of "handicap," 42 USC 3604(f)(1), which includes a mental impairment which substantially limits one or more major life activities, 42 USC 3602(h)(1). Discrimination includes "a refusal to make reasonable

accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" 42 USC 3604(f)(3)(b).

Accordingly, an accommodation is required for persons with disabilities "if the accommodation is (1) reasonable and (2) necessary (3) to afford handicapped persons equal opportunity to use and enjoy housing." *Bryant Woods Inn, Inc v Howard Co, Md*, 124 F3d 597, 603 (CA 4, 1997). An accommodation is reasonable "if it imposes no fundamental alteration in the nature of a program or undue financial and administrative burdens." *Hollis v Chestnut Bend Homeowners Ass'n*, 760 F3d 531, 542 (CA 6, 2014) (quotation marks and citation omitted). An accommodation is necessary if there is a direct link between the proposed accommodation and the opportunity to be provided to the disabled person. *Bryant Woods*, 124 F3d at 604. Further, an individual is not entitled to "accommodations that increase a benefit to a handicapped person above that provided to a nonhandicapped person with respect to matters unrelated to the handicap." *Id*. The burden is on the party seeking the accommodation to demonstrate that the accommodation is reasonable and necessary. *Hollis*, 760 F3d at 544.

Plaintiff argues that the accommodation in this case was placing a commercial medical facility in a residential area. Plaintiff's argument has no record support. As previously discussed, the Commission determined that the use was a convalescent home in the M-AF district and cabin colonies and a restaurant in the P-LS district. These uses are allowed by special use permit in the respective districts. While the Commission indicated that it was making an accommodation in granting the special use permit, this accommodation amounted to waiving Cheboygan Zoning Ordinance § 18.7.e's requirement that the person applying for a special use permit demonstrate beforehand that the proposed use would "not place demands on fire, police, or other public resources in excess of current capacity." The Commission instead decided to accommodate intervenors by conditioning the special use permit on the results of a police, fire, and ambulance impact study. The Commission also noted that even if there was some increased burden on law enforcement, it would not merit denying the special use permit. The Commission otherwise determined that the Farm met the requirements for granting a special use permit.

The actual accommodation the Commission ordered was directly linked to the residents' mental disabilities. The record demonstrated that the Farm's residents may require more public services than nondisabled residents, even if only to the extent that public services might be called to retrieve persons who wandered off site or because people with mental disabilities are an at-risk group. There is no indication that the accommodation fundamentally alters the Cheboygan County zoning scheme. The accommodation that the Commission granted was to waive the requirement that intervenors demonstrate up front that there would be no impact on public services beyond those services' current capacities. The Commission instead required that intervenors make this showing after the fact. Delaying this proof does not undermine the basic purpose of Cheboygan Zoning Ordinance § 18.7.e's requirement.

To the extent the Commission allowed intervenors to make a delayed showing under § 18.7.e and determined that the special use permit may be granted even if there is some increased burden on law enforcement, we conclude that the Commission's reasonable accommodation ensures that any burden will not be an *undue* burden. An undue burden is a burden that requires more than "reasonable costs" or "modest, affirmative steps to accommodate the handicapped[.]"

*Quad Enterprises Co, LLC v Town of Southold*, 369 Fed App'x 202, 207 (CA 2 2010) (citation omitted). Reasonable costs are more than de minimis costs. See *Shapiro v Cadman Towers, Inc*, 51 F3d 328, 334-335 (CA 2, 1995). This analysis requires a court to "balance the plaintiff's interest in equal housing against the defendant's interest in the integrity of the scheme that would be altered as a result of the accommodation." *Salute v Stratford Greens Garden Apartments*, 136 F3d 293, 311 (CA 2, 1998). Weighing the costs of the proposed accommodation is an appropriate part of the fact-specific inquiry to determine whether an accommodation is reasonable. See *Staron v McDonald's Corp*, 51 F3d 353, 356 (CA 2, 1995).

Again, it is important to keep in mind the nature of the accommodation that the Commission allowed. The Commission conditioned the Farm's special use permit on the results of a police, fire, and ambulance impact study. The actual modification was allowing intervenors to request police comment after the fact and to demonstrate the requirements of § 18.7.e were met through a study rather than requiring them to demonstrate that their demands would not exceed service capacity as part of their application. Further, the Commission found that even if there was some increased burden on law enforcement, it would not necessarily merit denying the special use permit. We note that Cheboygan County Zoning Ordinance § 18.7.e requires a finding that the increased burden will not exceed "current capacity." This is not the same as requiring the applicant to demonstrate no increased burden at all. Thus, at this point in time, it is not apparent that intervenors will not satisfy § 18.7.e; and, even if there is some increase in demand beyond "current capacity," there is no basis in the record to overturn the Commission's finding that some increased burden would not necessarily be disproportionate to accommodating the residents' disabilities.[8]

---

[8] The record before us does not include the results of the impact study. It is unclear whether the study has been conducted yet or if intervenors have requested comment on the safety issue from the police and sheriff's departments. Further, while the Commission indicated that intervenors should be accommodated even if there is an increased burden on law enforcement, considering the Commission's decision as a whole, we do not read this as suggesting that *any* increase, no matter how great or unreasonable the resulting cost, should be accommodated. Instead, at this juncture, the Commission has merely given conditional approval for the special use permit and, until the study is completed, the law enforcement issue remains unresolved. When the impact study has been completed and comments from law enforcement elicited, the Commission will have to consider whether there will be an increased burden beyond the "current capacity" under § 18.7.e and whether such an increase, if any, must be allowed as a reasonable accommodation. At that time, the Commission's decision on this issue may be challenged. In short, our decision should not be read to suggest that *any* increase in the demands on fire, police, or other public resources is permissible under § 18.7.e or that *any* such increase must be allowed as a reasonable accommodation.

Given our conclusions regarding the special use permits and the reasonable accommodations relating to § 18.7.e, we find it unnecessary to address plaintiff's argument regarding exclusionary zoning.[9]

## V. WHETHER COMPETENT, MATERIAL, AND SUBSTANTIAL EVIDENCE SUPPORTS THE COMMISSION'S DECISION

Finally, plaintiff argues that several of the Commission's findings are not supported by competent, material, and substantial evidence. We disagree.

First, plaintiff argues that there is no evidence to support the Commission's finding that therapeutic farms do not require extensive acreage. Plaintiff's argument mischaracterizes the record. After noting several existing therapeutic farms set on lands that ranged from 300 to 630 acres, the Commission stated, "There has been no information furnished which indicated the necessity of hundreds of acres to accomplish the stated purposes of therapeutic farms of this type." A statement that there is no information in the record is not the same as a finding in favor of a statement.

Second, plaintiff argues that the Commission's finding that the property would only be used as a therapeutic farm is erroneous because there is nothing to stop intervenors from altering the use of the property. However, the zoning ordinance itself prohibits the Farm from changing uses. The Commission found that intervenors intended to put into place and operate a therapeutic farm and that the purpose of the land used was to operate a therapeutic farm community. If approved, a special land use "shall be . . . operated in strict compliance with the approved special use permit and any conditions of approval." Cheboygan Zoning Ordinance, § 18.10. Accordingly, should intervenors cease to operate the Farm in compliance with the permitted special use, it would lose its special use permit. Plaintiff's statement that nothing in the permit would prevent a change in use is technically correct, but the ordinance itself provides that intervenors must use the property in the way stated in the approved permit.

Third, plaintiff contends that the Commission's finding that the Farm would operate as a convalescent home is not supported by competent, material, and substantial evidence. This calls for a conclusion of law, not a finding of fact. See *Great Lakes Soc*, 281 Mich App at 408. For the reasons stated earlier, the Commission properly determined that the Farm was a convalescent home in the M-AF district. For the same reason, plaintiff's fourth argument—that the Commission's findings did not comply with Cheboygan Zoning Ordinance § 18.7.a—also fails.

Fifth, plaintiff argues that the Commission's findings fail to address possible environmental issues that might affect its conclusions under Cheboygan Zoning Ordinance §§ 18.7.b and g. Cheboygan Zoning Ordinance § 18.7.b provides that a special use shall not

---

[9] To the extent that plaintiff briefly argues that the existence of a federal lawsuit likely affected the Commission's decision-making process, we have reviewed the record and reject this argument. There is no evidence to support that the existence of the federal lawsuit affected the Commission's decision.

"create a substantially negative impact on the natural resources of the County or the natural environment as a whole." Cheboygan Zoning Ordinance § 18.7.g provides that the proposed use must "be adequately served by water and sewer facilities, and refuse collection and disposal services." A review of the site plan indicates that no construction will be conducted in the wetland area of the property. Similarly, a review of the site plan shows a drain field on the portion of the property zoned M-AF. The staff report indicated that staff had not been able to identify an impact on environmentally sensitive areas. It also indicated that any construction would require a permit for storm water management. We conclude that the record supports the Commission's finding that "no construction will be conducted within the areas designated as wetlands" and that the drain field was sized adequately and located away from the wetlands.

Sixth, plaintiff argues that the Commission's finding that traffic would not increase is unsupported by competent, material, and substantial evidence. The Cheboygan Zoning Ordinance provides that "[t]he proposed special land use shall not increase traffic hazards or cause congestion on the public or private highways and streets of the area in excess of current capacity." Cheboygan Zoning Ordinance, § 18.7.f. The Commission's staff reported that "[t]raffic increase is expected to be minimal to moderate." Accordingly, evidence in the record supports the Commission's finding that the Farm would not increase traffic hazards or add "much in the way of additional congestion." Regardless of whether the Commission appropriately considered whether other uses would have more or less impact on traffic, the record evidence supports its finding. In sum, we conclude that competent, material, and substantial evidence supports the Commission's findings that plaintiff challenges on appeal.

Affirmed.


/s/ Peter D. O'Connell
/s/ Joel P. Hoekstra
/s/ Brock A. Swartzle