*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SALVATORE CUCCHIARA and MARIA
CUCCHIARA,

UNPUBLISHED
April 15, 2021

Plaintiff/Counterdefendant-Appellee,

v

No. 351199
Huron Circuit Court
LC No. 19-105600-CK

MONICA CUCCHIARA,

Defendant/Counterplainitff/Third-
Party Plaintiff-Appellant,

v

STOCKPOT, LLC,

Third-Party Defendant.

Before: BECKERING, P.J., and FORT HOOD and RIORDAN, JJ.

PER CURIAM.

Defendant/counterplaintiff[1] appeals as of right the trial court's judgment in favor of plaintiffs, Salvatore and Maria Cucchiarra, quieting title to real property to plaintiffs and dismissing defendant's counterclaims against plaintiffs and third-party defendant, Stock Pot, LLC (Stock Pot). Defendant also appeals the trial court's underlying decision denying an earlier motion for summary disposition. Because we agree with defendant that the trial court erred in determining that ambiguities existed in a contract in which there were none, and because the trial court erred

---

[1] As further detailed below, third-party defendant Stock Pot, LLC, has not appeared for this appeal, and, to the extent that Stock Pot continues to have an interest in this case, it is ancillary to the disagreement between the plaintiffs and defendant Monica Cucchiara. As such, the use of "defendant" throughout refers to Monica Cucchiara only.

-1-

by failing to apply the contract according to its plain and unambiguous terms, we reverse and remand for entry of a judgment in favor of defendant.

## I. FACTUAL BACKGROUND

This case arises out of a contract dispute between plaintiffs and defendant concerning the sale of real property. In 1982, defendant started a restaurant known as Joe's Pizzeria in Port Austin, Michigan, with her now-deceased husband, Giuseppe Cucchiara. Giuseppe was plaintiff Salvatore's brother. In 1985, Salvatore immigrated from Italy to work with his brother at the restaurant. Around this time, Salvatore met and married plaintiff Maria.

Beginning around 1992, Giuseppe and Salvatore began orally negotiating the potential sale of Joe's Pizzeria to plaintiffs. In 1995, Giuseppe approached defendant and expressed an intent to sell the pizzeria to plaintiffs.[2] Defendant did not want to sell the restaurant, but after discussing the issue with Giuseppe at length, agreed to the sale on the condition that the subsequent purchase agreement would contain an optional-repurchase provision so that, in the event that plaintiffs ever sought to sell the restaurant, defendant and Giuseppe would have the right to repurchase it for the same price for which it was sold. In February 1995, the parties executed the purchase agreement that is the subject of this litigation. Defendant and Giuseppe agreed to sell the property to plaintiffs for the sum of $130,000. The purchase agreement contained the following provision: "In such time, purchaser decides to sell subject property, must give seller first option to buy at cost."

Following the sale, plaintiffs operated Joe's Pizzeria until 2002, when it burned down. Plaintiffs then utilized approximately $347,000 in insurance proceeds following the fire to build a substantially improved restaurant. Later, in 2008, plaintiffs spent approximately $22,000 to obtain a liquor license on the property. Plaintiffs testified that the improved structure and liquor license greatly increased sales at the restaurant.

In 2018, plaintiffs decided to sell the restaurant and contracted their realtor, Casey Bruce. In July 2018, Bruce valued and listed the property for $529,000. Shortly thereafter, Bruce was contacted by defendant, who indicated her interest in repurchasing the property. Bruce and defendant provided conflicting testimony with respect to whether defendant made Bruce aware of the 1995 purchase agreement and the optional-repurchase provision at that time, or whether Bruce was made aware in early 2019, after plaintiffs executed a $450,000 purchase agreement with Stock Pot for the sale of the subject property and liquor license. In any event, around the time that plaintiffs executed their agreement with Stock Pot, defendant hired an attorney and prepared an affidavit of interest on the basis of the optional-repurchase provision, and prepared an offer to repurchase the subject property for $130,000.

In light of defendant having provided the affidavit of interest and $130,000 offer, plaintiffs executed an amendment to their agreement with Stock Pot wherein plaintiffs agreed to file a

---

[2] Defendant contends, and plaintiffs dispute, that Giuseppe sought to sell the restaurant as a family favor to plaintiffs. Notably, at that time, Defendant and Giuseppe had opened and were operating a second restaurant known as Giuseppe's Pizzeria in Caseville, Michigan.

lawsuit to clear any cloud on their title to the property, and agreed that closing between plaintiffs and Stock Pot would occur after plaintiffs obtained marketable title. Plaintiffs simultaneously executed a lease agreement with Stock Pot so that Stock Pot could begin operating on the premises while the case was litigated.[3]

Plaintiffs filed the present action for declaratory relief in early 2019, seeking a declaration that the optional-repurchase provision relied on by defendant was unenforceable on the basis that it had no time limitation, and on the basis that, following the 2002 fire and reconstruction of the property, the business and building were fundamentally different from what was sold to plaintiffs in 1995. Defendant filed a counterclaim against plaintiffs and Stock Pot seeking damages for breach of the 1995 purchase agreement, specific performance, quiet title, declaratory relief, and a permanent injunction. Defendant subsequently filed a motion for summary disposition contending that the optional-repurchase agreement was unambiguous, that plaintiffs had no valid defense to the legal enforceability of the option, and that defendant was entitled to relief as a matter of law. The trial court concluded, however, that the "in such time" and "at cost" phrases in the optional-repurchase provision rendered the provision ambiguous. The Court noted that it needed additional evidence to determine the scope and enforceability of the provision, and therefore denied defendant's motion.

Following a bench trial, the trial court noted its previous conclusion with respect to the summary disposition motion that the language of the optional-repurchase provision was ambiguous, but found that defendant's testimony at trial seemed to resolve the ambiguities. The court agreed with defendant that "at such time" meant "when," and "at cost" meant "for the price the subject property was originally sold." Thus, the court concluded that the plain terms of the optional-repurchase provision afforded defendant the right to repurchase the subject property at the price for which it was sold whenever and if ever plaintiffs expressed an intent to sell it. The court continued, however, that the provision "was for the business founded by Giuseppe" and defendant in 1982.

Although the optional-repurchase provision ordinarily would apply, the trial court concluded that it was not enforceable in this case because an unreasonable amount of time had lapsed. The court based its determination with respect to reasonability largely on the events that occurred in 2002:

> [T]his is what I call the potential death, so to speak, of Joe's Pizzeria in 2002; there was a fire in 2002 where the business was completely destroyed. The business was closed for over eight months. During that timeframe, there is no business; there is no good will; there is not building [sic]; there is no equipment; there's nothing.

The court continued: "After that fire the business originally created and built and eventually sold to Salvatore and Maria ended. It was lost forever." The court partially supported this conclusion by noting the inequity that would result to plaintiffs if they were forced to sell the subject property

---

[3] Plaintiffs note in their brief on appeal that Stock Pot has since backed out of its deal with plaintiffs due to the protracted litigation in this case, and that Stock Pot is no longer interested in purchasing the subject property.

pursuant to the terms of the optional-repurchase provision. The court noted that plaintiffs could have taken the insurance proceeds following the 2002 fire and provided the option to defendant to repurchase at that time, but they did not do so. Instead, plaintiffs invested their money back into the business, and the Court felt that equity should permit plaintiffs to retain that investment. On the basis of all of the above, the trial court concluded that defendant's option to repurchase the property "ended when the business ended in 2002."

Thereafter, the trial court entered a judgment in favor of plaintiffs quieting title to the subject property. The trial court further dismissed defendant's counterclaims against plaintiffs and Stock Pot with prejudice. This appeal followed.

## II. ANALYSIS

"We review a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo." *Chelsea Inv Group LLC v Chelsea*, 288 Mich App 239, 250; 792 NW2d 781 (2010). A finding is clearly erroneous when this Court is left with a definite and firm conviction that a mistake has been made. *Id.* at 251. "Questions involving the proper interpretation of a contract or the legal effect of a contractual clause are also reviewed de novo." *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197; 747 NW2d 811 (2008).

As a preliminary matter, we disagree with the trial court's conclusion that the optional-repurchase provision is ambiguous, and that the additional testimony of defendant was necessary to resolve the ambiguities. As we have noted before:

> The goal of contract interpretation is to first determine, and then enforce, the intent of the parties based on the plain language of the agreement. *St Clair Medical, PC v Borgiel*, 270 Mich App 260, 264; 715 NW2d 914 (2006). If no reasonable person could dispute the meaning of ordinary and plain contract language, the Court must accept and enforce the language as written, unless the contract is contrary to law or public policy. *Rory v Continental Ins Co*, 473 Mich 457, 468; 703 NW2d 23 (2005). Plain and unambiguous contract language cannot be rewritten by the Court "under the guise of interpretation," as the parties must live by the words of their agreement. *Upjohn Co v New Hampshire Ins Co*, 438 Mich 197, 207; 476 NW2d 392 (1991). [*Harbor Park Mkt, Inc v Gronda*, 277 Mich App 126, 130–31; 743 NW2d 585 (2007).]

That is, "[a]bsent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement." *Universal Underwriters Ins Co v Kneeland*, 464 Mich 491, 496; 628 NW2d 491 (2001). In interpreting the words, we consider the agreement as a whole and give meaning to all of its terms. *Auto-Owners Ins Co v Churchman*, 440 Mich 560, 566; 489 NW2d 431 (1992).

"A right of first refusal, or preemptive right, is a conditional option to purchase dependent on the landowner's desire to sell." *Randolph v Reisig*, 272 Mich App 331, 336; 727 NW2d 388

(2006).[4] A preemptive right, also known as an option contract, specifically creates in the promisee "the power to purchase the property at will for the specified price during the specified period." *Id*. at 339. See also *Old Mission Peninsula Sch Dist v French*, 362 Mich 546, 559; 107 NW2d 758 (1961) ("A pre-emptive clause is one, generally found in a deed, which requires that before the subject property may be sold to others it must first be offered at specified terms to a particular person or persons who have the right to buy or reject it."). Ordinarily, these types of contracts should "contain a definite time for performance," however, they are not void "merely because they lack a specific time for performance." *Randolph*, 272 Mich App at 336-337. "Rather, in the absence of a specific time, courts will construe agreements 'to be for a reasonable period of time,' and thus, such agreements are valid only for a reasonable period." *Id*. at 337, quoting *Brauer v Hobbs*, 151 Mich App 769, 775-776; 391 NW2d 482 (1986).

As noted, the contract in this case provided: "In such time, purchaser decides to sell subject property, must give seller first option to buy at cost." While the provision could have been more artfully drafted, the paragraph does not appear to modify any other provision of the contract. That is to say, although it might appear on its face to do otherwise, "in such time" does not modify or is not itself modified by any preceding or subsequent provision in the contract. With that in mind, neither plaintiffs nor the trial court have adequately explained how the phrases "in such time" and "at cost" rendered the contractual language in this case ambiguous.

Plainly, and particularly in light of the fact that there is no other provision of the contract modifying or being modified by the phrase "in such time," the only reasonable interpretation of the same is that it was intended to mean "when." The trial court ultimately came to this conclusion, but did so largely on the basis of defendant's testimony about her personal understanding of the phrase. But, "[t]he meaning of clear and unambiguous contract language is a question of law." *Harbor Park*, 277 Mich App at 131. Defendant's personal understanding of the language would only be relevant to determining the underlying intent of the parties *after* the trial court had already determined that reasonable persons could dispute the meaning of the language, i.e., that the contract was ambiguous. See *In re Smith*, 480 Mich 19, 24; 745 NW2d 754 (2008) ("[I]f the contractual language is ambiguous, extrinsic evidence can be presented to determine the intent of the parties."). Again, within the context of the contract as a whole, exactly why or how "in such

---

[4] We note that there are some differences between a right of first refusal and a preemptive right, or option contract. The parties do not dispute that the contractual provision in this case constitutes an option to repurchase, but we nonetheless think it prudent to definitively clarify for the purposes of the available remedies in this case that the nature of the contract here is that of an option contract. The difference between the two is that an option contract creates a conditional offer and the power of acceptance in the promisee, while the right of first refusal merely provides that a purchaser may not sell a property until they have given the promisee an opportunity to make an offer first. See *Brauer v Hobbs*, 151 Mich App 769, 775-776; 391 NW2d 482 (1986). See also *Randolph*, 272 Mich App at 339 (noting that "the right of first refusal gives the holder fewer rights than an option" because a promisee "cannot exercise any right to purchase property unless the seller decides to sell to a different buyer").

time" could reasonably be interpreted as meaning anything other than "when" has not been adequately explained by the trial court or plaintiffs.

Similarly, the phrase "at cost" is commonly used in legal contracts and we have noted its meaning before as referring to sales or services that are provided without profit. See *Great Lakes Society v Georgetown Charter Twp*, 281 Mich App 396, 409; 761 NW2d 371 (2008). See also *Alticor, Inc v Dep't of Treasury*, unpublished per curiam opinion of the Court of Appeals, issued February 9, 2016 (Docket No. 323350), p 4 (indicating that services provided "at cost" are provided without the object of gain or desire for a profit). *Merriam-Webster's Collegiate Dictionary* (11th ed) defines the phrase as referring to something that is sold "for the price of production." With the above in mind, we conclude that the trial court erred when it determined that this language was ambiguous both at the time that it denied defendant's motion for summary disposition and when it implied that ambiguities existed at the end of trial.

The larger issue in this case, however, is not the trial court's interpretation of the contract, because, as noted, it ultimately reached the correct interpretation. Instead, the central issue is the trial court's determination that the optional-repurchase provision was unenforceable because an unreasonable amount of time had passed since the 1995 purchase agreement and plaintiffs' 2018 expression of intent to sell the property. We agree with defendant that the trial court erroneously made its determination, not on the basis of the amount of time that had lapsed, but on the basis that the 2002 fire on the subject property essentially constituted the "death" of the business that was sold in 1995, and that defendant's option to purchase the business died along with that business. We also note that it was erroneous for the trial court to tangentially support its conclusion with reference to the investments and improvements plaintiffs made to the subject property following the fire, and the inequity that would result if plaintiffs were forced to sell the property at a price less than what it was worth on the basis of those investments. In light of the above, we agree with defendant that plaintiffs are bound by the plain and unambiguous terms of the contract, and that apart from the largely irrelevant factors relied on by the trial court, there is otherwise no evidence or law to indicate that the 23-year period in this case between the sale of the property and the expression of intent to exercise the repurchase option was so unreasonable a duration of time as to render the provision unenforceable.

First, the "death-of-the-business" analogy employed by the trial court has no basis in either law or the language of the contract at issue. There is caselaw to suggest that the death of a party to an option contract can extinguish the rights that would have existed under the contract, but this is quite different from the trial court's analogy. In *Old Mission*, 362 Mich at 547, the original grantors sold a 1-acre plot of property to the plaintiff school district in 1893 for $50. The 1893 deed provided as follows:

> Provided that in case said school district should desire to sell said lot at any time said grantors shall have the right before all others to buy said lot at the same price now received for same, to-wit, $50, the buildings thereon to be also paid for by said grantors at a fair price in addition to said $50. [*Id*. at 548.]

Over 60 years later, after the original grantors had died, the plaintiff listed the property for sale and received an offer for $4,300 "conditioned upon its bringing a successful suit to quite title . . . against the heirs of the grantors." *Id*. at 547-548. The plaintiff brought its suit, and the heirs of

the grantors countersued for specific performance. *Id*. at 548. Our Supreme Court concluded that, while "[s]uch a clause obviously could be drafted so as clearly to express the intent of the parties to make the right of pre-emption either personal or descendible," the clause in this case did not do so. *Id*. at 549-550. Accordingly, where the language of the clause created an option to purchase in the grantors specifically, that option was not automatically descendible, and thus terminated upon the death of the grantors. *Id*. at 550, 552.

In *Brauer*, the grantors entered into a purchase agreement with the plaintiff for the sale of one parcel of land, and for the "indefinite" option to purchase a second parcel for $40,000 if the grantors ever decided to sell it. *Brauer*, 151 Mich App at 772-774. We noted in that case that the purported option agreement was in fact a right of first refusal, but in any event, we concluded that the right terminated upon the death of the grantors. *Id*. at 779. We further noted that, "if [the] plaintiff intended to bind [the grantors] heirs, [he] should have so provided" in the contract. *Id*.

Similarly, in *Waterstradt v Snyder*, 37 Mich App 400, 401; 194 NW2d 389 (1971), the original grantee was bound by an option contract that would permit the plaintiff-grantors the right to repurchase the property for $9,000 if the grantee ever desired to sell it. When the grantee died testate, the executor of her estate sought to sell the property for $15,000, and the plaintiffs brought suit to enforce the option. *Id*. at 401-402. We noted as follows:

> The language in the deed means just what is says, nothing more, nothing less. "If the grantee * * * ever desires to sell the * * * property, the grantors * * * have a right to buy the same for $9,000."
>
> If [the grantee] had desire to sell, she would have exercised her option to do so. Then the grantors could have exercised their option to buy it back at the specified price. She did not, so the grantors could not.
>
> If the grantors had meant to bind [the grantee's] personal representative, her successors in title, or assigns (assuming they could), they should have said so. We decline to rewrite the language of the option. We make no distinction between "personal representative" and "successor" or "assigns." In logic, we could not do so. We hold that the option to repurchase terminated on the death of the grantee because it required her personal volitional act in her lifetime. [*Id*. at 402-403 (footnote omitted).]

Quoting *Old Mission*, we further noted that "[t]here is a strong tendency to construe an option or pre-emption to be limited to the lives of the parties, unless there is clear evidence of a contrary intent." *Id*. at 403, quoting *Old Mission*, 362 Mich at 551.

Nothing about the above cases or any of the cases cited by either plaintiffs or the trial court permit the analogy employed by the trial court. And, as defendant aptly points out, the underlying reasoning of *Old Mission*, *Brauer*, and *Waterstradt* involved interpretation of the plain language of the contracts at issue in those cases. By its plain language, the provision in *Old Mission* was binding on the grantee and created a right in the grantors but said nothing about the rights of their heirs, *Old Mission*, 362 Mich at 548-550, and the provisions in *Brauer* and *Waterstradt* did exactly

the same, *Brauer*, 151 Mich App at 772-773 and *Waterstradt*, 37 Mich App at 401-402.[5] Contrarily, in this case, the trial court analogized the death of a business to the death of a contracting party when nothing about the language of the contract or the relevant caselaw suggested the same was permissible. As defendant notes, the option provision in this case specifically granted defendant the option to repurchase the "subject property," and that property did not "die" in the 2002 fire. With that in mind, we agree with defendant that the trial court erred in concluding that defendant's right to repurchase was extinguished along with the building that burned in 2002.

Next, and for the same reasons, we conclude that the trial court's equitable considerations concerning the improved value of the subject property were outside the bounds of the contract's terms. Like the contracts in the above cases that lacked language concerning whether they were descendible, if the plaintiffs in this case desired to retain the value of improvements made to the property upon a resale of the property to defendant, they could have written those terms into the contract. They did not. See *Old Mission*, 362 Mich at 548 (quoting the contract in that case, which specifically indicated that, in addition to the $50 repurchase price, the buildings contained on the lot were to be "paid for by said grantors at a fair price"). See also *Bennett v Eisen*, 64 Mich App 241, 242; 235 NW2d 749 (1975) (wherein the contracting parties included in their option provision that the property could be repurchased at a fixed price so long as "the property remain[ed] unimproved," and further included that "[s]hould buildings be erected on th[e] site, [the parties] are to determine a fair market value of the buildings at the time of sale").

Again, plaintiffs could have sought to include similar language in the 1995 purchase agreement, but they did not. Instead, plaintiffs' primary argument throughout this case has been that they should not be bound by the provision because they did not know it existed, and alternatively, that they should be permitted to retain their investment into improvements on the property as a matter of equity. Plaintiffs have provided no caselaw or legal argument to explain how this Court could conclude that they are not bound to the plain terms of the contract that they signed.[6]

Plaintiffs refer to *Pleger v Bouwman*, 61 Mich App 558, 561; 233 NW2d 82 (1979) for the contention that specific performance is not an appropriate remedy in this case. In that case, we affirmed the trial court's order awarding the plaintiffs specific performance of an option to purchase. *Pleger*, 61 Mich App at 562. Plaintiffs appear to cite the case for its discussion as to

---

[5] Later, in *Randolph*, we employed the same logic when we noted that the right of first refusal in that case explicitly and permissibly bound "heirs, successors, representative and assigns" of the property owners. *Randolph*, 272 Mich App at 337-338.

[6] We note the suggestion in plaintiffs' brief that defendant and Giuseppe induced plaintiffs into believing that "certain facts exist[ed]," and plaintiffs relied upon those facts when they entered into the 1995 purchase agreement. To the extent that plaintiffs seek to argue that they signed the 1995 purchase agreement on the basis of fraud or misrepresentation, they have not adequately supported or analyzed the issue. It is also worth noting that the evidence presented at trial does not establish such a claim, particularly in light of plaintiffs' own admissions that they themselves declined to read the contract before signing it.

whether the plaintiffs may have failed to strictly comply with an option provision by putting their request to exercise the option in writing and providing it to the defendants. We concluded that the plaintiffs in that case did comply with the requirements, *id*. at 562, but for the purposes of this case, the insinuation seems to be that defendant failed to comply with the requirements of the option provision in this case and thus should not be awarded specific performance. Plaintiffs do not refer to any particular failure on defendant's part, other than suggesting that defendant could have and should have informed plaintiffs of her desire to exercise the option at an earlier date. Specifically, plaintiffs suggest that defendant should have indicated her desire to exercise the option before plaintiffs used their insurance proceeds to rebuild the business on the subject property after the 2002 fire. This argument is without merit. Defendant was entitled under the option to repurchase the subject property only in the event that plaintiffs intended to sell it, and there is no evidence to suggest that plaintiffs ever expressed an intent to sell the property before 2018.

Plaintiffs further cite *Brauer* for the contention that it is within the realm of the trial court to determine what constitutes a reasonable amount of time to exercise an option contract, and that the trial court was permitted to determine that the essence of the 1995 purchase agreement was for the building on the subject property as opposed to merely the land. Indeed, we noted in that case that, had the relevant right of refusal not terminated upon the death of the grantees, "[o]rdinarily, we would remand th[e] case to the trial court for a determination of what period of time is reasonable under the circumstances." *Brauer*, 151 Mich App at 778-779. However, in this case, and as noted throughout, the only evidence the trial court felt rendered the amount of time unreasonable was the fire that occurred in 2002 and the subsequent improvements plaintiffs elected to make to the property. We disagree with the trial court's conclusion that defendant's rights were extinguished when the building on the subject property was burned. And, we further note that there was otherwise little evidence to suggest that the 23-year time period that lapsed was an unreasonable amount of time to enforce the plain terms of the agreement.[7]

Additionally, *Brauer* provides no support for plaintiffs' contention that the trial court was permitted to conclude that the purchase agreement was for the value of the business or something other than what was specifically listed in the agreement. The sale in this case was for the "subject property," and the trial court specifically rejected attempts by defendant to delineate what portion of the $130,000 in 1995 was attributable to the business versus the plot of land itself. The court concluded that $130,000 merely represented the value of the land as a whole in 1995. To that end, it was problematic for the trial court to at once conclude that the subject of the 1995 purchase agreement was the physical land valued at $130,000, to only later determine that the subject of the optional-repurchase provision was something else, e.g., the value of the business on the physical land. In any event, all that is to say that plaintiffs fail to explain how *Brauer* supports the

_____

[7] As noted above, in *Old Mission*, over 60 years passed before the option to repurchase was exercised, and the issue in that case was neither the amount of time that had passed or the significant increase in the value of the property. See *Old Mission*, 362 Mich at 547-548. Rather, the issue was that the plain language of the contract did not indicate that the option provision was descendible. *Id*. at 551-552.

contention that trial courts may determine the subject matter of an unambiguous contract with reference to evidence other than the plain terms of that contract.

With all of the above in mind, we agree with the trial court that the option provision permitted defendant to repurchase the subject property for the value she sold it upon plaintiff's expression of an intent to sell. We disagree, however, with the court's determination that the 2002 fire on the property extinguished that right or that the option was subject to language that it did not contain, such as language that would have entitled plaintiffs to retain a profit for improvements they elected to make on the land. On the basis of plaintiffs' intent to sell, which is clearly evidenced by plaintiffs having contracted with Stock Pot for the same, defendant is entitled to exercise her option and repurchase the subject property for the same value that it was sold.

Reversed and remanded for entry of a judgment awarding defendant specific performance of the optional-repurchase agreement. We do not retain jurisdiction.

/s/ Jane M. Beckering
/s/ Karen M. Fort Hood
/s/ Michael J. Riordan

-10-